IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel. MAURICE COLEMAN (#A-25160), | ) ) ) | |
| Petitioner, | ) ) | |
| | ) | Case No. 99 C 2635 |
| v. | ) ) | |
| DON HULICK, Warden, Menard Correctional Center,[1] | ) ) ) | |
| Respondent. | ) ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Petitioner Maurice Coleman's petition for a writ of habeas corpus and

supplemental habeas petition pursuant to 28 U.S.C. § 2254(d)(1).[2]  For the following reasons, the

Court denies Coleman's habeas petition.  The Court also denies Coleman's request for an

evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2).

## BACKGROUND

Coleman does not present clear and convincing evidence challenging the statement of

facts set forth in the Illinois Appellate Court's opinions affirming the judgments of the Circuit

Court of Cook County, and thus the Court presumes those facts are correct for purposes of its

habeas review.  *See* 28 U.S.C. § 2254(e)(1); *see also Virsnieks v. Smith,* 521 F.3d 707, 714 (7th

---

[1] Petitioner Maurice Coleman is currently incarcerated at Menard Correctional Center, and thus the Court substitutes Don Hulick, Warden of Menard Correctional Center, as the Respondent.  *See* Fed.R.Civ. P. 25(d).

[2] On July 2, 2008, the Executive Committee for the Northern District of Illinois reassigned Coleman's habeas petition to this Court pursuant to Rule 13 of the Internal Operating Procedures.  (R. 56-1.)

Cir. 2008).  Therefore, the Court adopts the underlying facts as set forth by the Illinois Appellate

Court.  *See People v. Coleman,* No. 1-95-4039 (Ill.App.Ct. July 31, 1998); *People v.  Coleman,*

179 Ill.App.3d 410, 128 Ill.Dec. 401, 534 N.E.2d 583 (Ill.App.Ct. 1989).  The Court begins with

a recounting of the facts as determined by the Illinois Appellate Court.  *See Easley v. Frey,* 433

F.3d 969, 970 (7th Cir. 2006).

## I.    Factual Background

The testimony at Coleman's trial reveals that on Sunday, August 2, 1981 at about 5:00

p.m., the victim, Terrell Jackson, was at his home on the south side of Chicago, Illinois where he

had fallen asleep on the floor while watching television in a second-floor bedroom.  Jackson's

younger brother, Arlander Adamson, was watching television in the first-floor living room and

Jackson's stepdaughter, Gwen Thomas, was in another second-floor bedroom with her baby.

On that same day, two men burst through the rear door of Jackson's residence.  The men

put their guns to Adamson's head and ordered Adamson to tell them who else was in the house.

Adamson then told them that his brother, his niece, and her baby were upstairs.  The two men

also asked Adamson if there were any drugs or money in the house.  One of the men suggested

that they should kill Adamson, but the other man disagreed.  The two men then bound and

gagged Adamson and forced him to accompany them upstairs.

Adamson indicated to the two men that his niece and her baby were in the room where

the door was closed.  The men, along with Adamson, went down the hallway to Jackson's room

and the men then ordered Adamson to lie on the floor.  They told Jackson to get up and asked

him, "Where is the s--t at?"  As Jackson awakened, the men fired six shots into Jackson's body.

One of the men took Jackson's jewelry and money and the other looked through various drawers

in the room while asking, "Where's the s--t?"

One of the men then left the room and went to Thomas' room, and with a gun in his hand, told Thomas to come with him. He then directed Thomas to Jackson's room. Thomas saw Jackson and Adamson lying on the floor. One of the men then told Thomas that if she did not tell them where "it" was, the two men would kill them. Thomas asked Jackson what the men wanted and where "it" was. Jackson said that he did not have anything and that he did not want to die. The two men nevertheless ransacked the room, went into the closets and under the mattress, and pulled out drawers. One of the men put something in his pocket. They also tied up Thomas and made her lie face down on the floor. The two men then left Jackson's residence.

Shortly thereafter, Thomas and Adamson untied each other. Thomas went downstairs, locked the doors, and then called the police, her grandmother, and her cousin while Adamson held Jackson, who was dying in his arms. Jackson died from a gunshot wound. After the police arrived, Adamson and Thomas gave the police descriptions of the two offenders. Later that evening, Adamson and Thomas looked through photograph books at the police station, but neither made an identification. A few weeks later on August 18, 1981, Thomas looked through a book of photographs that Chicago Police Detectives brought to the home of Thomas' friend. Thomas identified a picture of Coleman as a picture of one of the offenders. On the following day, Thomas and Adamson identified Coleman in a lineup at a Chicago police station.

## II.     Procedural Background

In 1983, a jury in the Circuit Court of Cook County found Coleman and his co-defendant Joseph Barnes guilty of murder and armed robbery, and the trial judge sentenced Coleman to prison terms of natural life and thirty years' imprisonment, respectively. (R. 17-1, Rule 5 Exs.,

Ex. A.)  Coleman appealed his judgment of conviction to the Illinois Appellate Court, First District, raising five issues:  (1) improper identification evidence was obtained in violation of his Sixth Amendment right to counsel and was wrongly used at trial; (2) his Sixth Amendment right to a jury composed of a cross-section of the community was denied because the trial court excluded all persons who were unalterably opposed to the imposition of the death penalty; (3) the trial court erred in admitting the State's rebuttal testimony to co-defendant Joseph Barnes' alibi witness; (4) cumulative prosecutorial error denied him a fair trial; and (5) the trial court failed to properly exercise its discretion by summarily denying the jury's request for a transcript of a witness' testimony.  (*Id*.)  On February 3, 1989, the Illinois Appellate Court affirmed Coleman's conviction and sentence.  (*Id*.)

On April 6, 1989, Coleman filed a petition for leave to appeal ("PLA") to the Supreme Court of Illinois, raising three claims:  (1) improper identification evidence was obtained in violation of petitioner's Sixth Amendment right to counsel and wrongly used at trial; (2) cumulative prosecutorial error denied petitioner a fair trial; and (3) the trial court failed to properly exercise its discretion by summarily denying the jury's request for a transcript of a witness' testimony.  (Ex. B.)  On June 1, 1989, the Supreme Court of Illinois denied Coleman's PLA.  (Ex. C.)

On March 1, 1990, Coleman filed a petition for post-conviction relief in the Circuit Court of Cook County pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.,* arguing that trial counsel was ineffective for failing to call occurrence witnesses Tracy and David Wilkins to testify.  (Ex. D.)  On September 23, 1992, Coleman filed a supplemental amendment to his post-conviction petition arguing that trial counsel was constitutionally

ineffective for failing to call potential witnesses Evelyn and Loretta Cade, a witness identified only as "Sleepy," and Roy Wright, along with counsel's failure to call Tracy and David Wilkins. (Ex. E.)  On August 9, 1994, Coleman filed another amended post-conviction petition alleging that his co-defendant Joseph Barnes admitted that Coleman was not involved in the underlying crimes and that Barnes' admission was corroborated by other evidence proving that Coleman was wrongly convicted.  (Ex. F.)  After granting Coleman an evidentiary hearing, the post-conviction court denied Coleman's amended post-conviction petition.  (Ex. G.)

Coleman appealed the Circuit Court's denial of his post-conviction petition to the Illinois Appellate Court arguing that the trial court abused its discretion in denying his amended post-conviction petition because Barnes' exculpatory statement was unavailable at trial and would have proven his innocence if introduced at a new trial.  (Ex. G.)  Coleman, however, did not argue that his trial counsel was constitutionally ineffective in his post-conviction appeal.  (*Id.*)  On January 1998, the Illinois Appellate Court affirmed the Circuit Court's denial of Coleman's amended post-conviction petition.

Coleman then filed a PLA to the Supreme Court of Illinois raising one issue – the trial court erred in denying the amended post-conviction petition because Barnes' testimony would have exonerated him.  (Ex. K.)  Coleman made no claims of ineffective assistance of counsel in his post-conviction PLA.  (*Id.*)  The Supreme Court of Illinois denied Coleman's post-conviction PLA on December 2, 1998.  (Ex. L.)

## III.    Habeas Petition

On April 20, 1999, Coleman filed the present pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. 2254(d)(1).  (R. 4-1.)  On June 20, 2002, the court reinstated and granted

Coleman's motion for appointment of counsel. (R. 18-1.) Nevertheless, on October 2, 2003, Coleman filed a pro se supplemental habeas corpus petition. (R. 22-1.) On October 31, 2006, Coleman, by counsel, filed an amended habeas petition. (R. 40-1.) In his amended petition, Coleman raises an ineffective assistance of trial counsel claim based on counsel's failure to: (1) call the Wilkins brothers to offer exculpatory testimony; (2) call Loretta and Evelyn Cade to offer alibi evidence; and (3) move to sever Coleman's trial from co-defendant Joseph Barnes's trial. Further, Coleman claims that "the state court's resolution of his newly discovered evidence claim of actual innocence constituted an unreasonable application of controlling federal law." Last, Coleman requests an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2). On July 2, 2008, the Executive Committee for the Northern District of Illinois reassigned Coleman's habeas petition to this Court pursuant to Rule 13 of the Internal Operating Procedures. (R. 56-1.)

## LEGAL STANDARDS

### I.     Habeas Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief cannot be granted unless the state court's decision was contrary to, or an unreasonable application of federal law clearly established by the Supreme Court. *See Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Calloway v. Montgomery,* 512 F.3d 940, 943 (7th Cir. 2008). In *Williams*, the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Id.* at 405.

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407. "This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005); *see also Williams*, 529 U.S. at 410 (an **unreasonable** application of federal law is different from an **incorrect** application of federal law) (emphasis in original). To be considered objectively unreasonable, a state court's decision must lie "well outside the boundaries of permissible differences of opinion." *Gilbert v. Merchant,* 488 F.3d 780, 790 (7th Cir. 2007) (quoting *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002)). In other words, to be reasonable, a state court's decision must be "at least minimally consistent with the facts and circumstances of the case." *Simpson v. Battaglia,* 458 F.3d 585, 592 (7th Cir. 2006) (citations omitted).

## II.    Procedural Default Standard

Before bringing a habeas claim in federal court, a petitioner must exhaust all remedies available to him in state court. *Lieberman v. Thomas,* 505 F.3d 665, 669 (7th Cir. 2007). More specifically, a habeas petitioner must fully and fairly present his federal claims to the state courts before he files his federal habeas petition. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Johnson v. Loftus,* 518 F.3d 453, 455 (7th Cir. 2008). Moreover, a "habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Lewis v. Sternes,* 390 F.3d 1019, 1026 (7th Cir. 2004); *see also Lieberman,* 505 F.3d at

670-71.

A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice or by showing that the Court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006); *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Supreme Court defines cause sufficient to excuse procedural default as "some objective factor external to the defense" which prevents a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). A fundamental miscarriage of justice occurs when a petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496.

## ANALYSIS

### I.      Actual Innocence Exception to Procedural Default

Respondent contends that Coleman's ineffective assistance of counsel claims are procedurally defaulted because Coleman failed to present them in one complete round of review to the Illinois state courts. *See Boerckel,* 526 U.S. at 845. The Court agrees. In fact, Coleman – by counsel – concedes this default, but argues that the procedural default is excepted by the miscarriage of justice exception based on Coleman's actual innocence. *See House,* 547 U.S. at 536-38; *Coleman,* 501 U.S. at 750. Indeed, although claims of actual innocence are not cognizable as stand-alone claims on federal habeas review, actual innocence relates to the "fundamental miscarriage of justice exception" providing a gateway for the Court to review the merits of Coleman's procedurally defaulted ineffective assistance of counsel claims. *See*

*Herrera v. Collins,* 506 U.S. 390, 400, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Milone v. Camp,* 22 F.3d 693, 699 (7th Cir. 1994) ("A claim of actual innocence is relevant to determining whether a habeas corpus petition may be brought before a federal tribunal at all; it is not ordinarily cognizable in determining whether the writ should issue.").

Accordingly, because a stand-alone claim of actual innocence is not cognizable on federal habeas review, Coleman's habeas claim that "the state court's resolution of his newly discovered evidence claim of actual innocence constituted an unreasonable application of controlling federal law" must fail. *See Schlup v. Delo,* 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (actual innocence claim is not constitutional claim, but is gateway through which habeas petitioners must pass to have procedurally defaulted constitutional claims considered on the merits) (citing *Herrera*, 506 U.S. at 404). In contrast, unlike claims on federal habeas review, the Illinois courts recognize actual innocence claims as free standing claims based on the Illinois Constitution. *See People v. Washington,* 171 Ill.2d 475, 489, 216 Ill.Dec. 773, 665 N.E.2d 1330 (Ill. 1996). The Court thereby turns to Coleman's actual innocence claim to determine whether it excepts his procedurally defaulted ineffective assistance of counsel claims.

## A.    Actual Innocence Standard

To establish actual innocence, a petitioner must support his allegations "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo,* 513 U.S. at 324. Under habeas review, the Court must consider all of the evidence "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of

admissibility that would govern at trial," to determine if "it was more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House,* 547 U.S. at 537 (internal quotations omitted); *Schlup,* 513 U.S. at 327. "To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia,* 403 F.3d 935, 938 (7th Cir. 2005). Because this type of evidence is unavailable in the vast majority of cases, actual innocence claims are rarely successful. *Schlup,* 513 U.S. at 324.

**B.    New Evidence**

In support of his actual innocence claim, Coleman relies on the May 23, 1994 affidavit of his co-defendant James Barnes, in which Barnes avers that "[a]t no time was Maurice Coleman a party of any of the acts that led up to or surrounded the death of Terrell Jackson; my co-defendant should have been Roy Wright." (R. 42-4, Supp. Pet. Exs., Ex.11, Barnes' Aff. ¶ 2.) Barnes further avers that the victim, Terrell Jackson, was a drug dealer and that Barnes was involved in a drug deal with Jackson and Wright. (*Id.* ¶¶ 5, 6.) According to Barnes' affidavit, a drug deal went bad and he became angry at Jackson. (*Id.* ¶¶ 7-16.) Thereafter, Barnes avers that he and Wright went to Jackson's home and shot him dead. (*Id.* ¶¶ 21-24.) In sum, Barnes avers that "Maurice Coleman was never a part of this incident. I was not a friend of Maurice Coleman's, however we had been arrested together in a sweep. Other than that contact I did not know Coleman except to see him in the neighborhood." (*Id.* ¶ 28.)

Coleman also relies on the December 13, 1994 affidavit of James L. Rhodes, an Assistant Public Defender, who represented Joseph Barnes at his jury trial. (R. 42-4, Ex. 12, Rhodes Aff.

¶ 3.) Rhodes avers that during the joint trial of Barnes and Coleman, Barnes told him that Coleman had nothing to do with Jackson's murder – information that was protected by the attorney-client privilege. (*Id.* ¶ 4.) Rhodes further avers that after the jury verdict, Barnes expressed dismay that Coleman had been convicted. (*Id.* ¶ 5.) The Rhodes affidavit also states that in 1994, Coleman's post-conviction lawyer approached Rhodes and Barnes to submit affidavits regarding Coleman's actual innocence claim, after which Barnes waived his right to the attorney-client privilege and allowed Rhodes to submit his present affidavit. (*Id.* ¶¶ 7-12.)

Further, Coleman submits the affidavits of Evelynn Cade and her daughter Loretta Cade in support of his actual innocence claim. (R. 42-4, Ex. 16, Cade Affs.) In her affidavit, Loretta Cade avers that Coleman was with her on August 2, 1981 – the day of Jackson's murder. Similarly, Evelynn Cade avers that she talked to Coleman on the telephone on August 2, 1981 for about fifteen minutes. Also, Coleman sets forth the affidavit of his attorney, Geary Krull, and Barnes' attorney, James L. Rhodes, that they presented to the trial court in their a motion to sever the jury trial. (R. 42-4, Ex. 10, Krull/Rhodes Aff.) The attorneys aver that after having a conversation with Tracey and David Williams – Jackson's next door neighbors – the Williams brothers would testify that Coleman was not one of the two men who the Williams brothers saw outside of Jackson's home on the day of the murder, although Barnes was. (*Id.*) As discussed below, the trial court denied counsels' motions to sever.

C.    **Trial Evidence**

At trial, eyewitnesses Arlander Adamson and Gwen Thomas testified that on August 2, 1982, two men – who they later identified as Coleman and his co-defendant Barnes –  burst through the rear door of Jackson's residence. Adamson testified that these two men had guns,

wanted to kill Adamson, and bound and gagged Adamson.  Coleman and Barnes then forced

Adamson upstairs at gunpoint.  After they arrived at Jackson's room, Coleman and Barnes

ordered Adamson to lie on the floor and fired six shots into Jackson's body.  Thereafter,

eyewitness testimony revealed that one of the men left the room and went to Thomas' room

where he told Thomas to come with him at gunpoint.  He directed Thomas to Jackson's room

where Thomas saw Jackson and Adamson lying on the floor.  The men threatened to kill

everyone after which they ransacked the room.  They also tied up Thomas and made her lie face

down on the floor.  Shortly thereafter, Jackson died of his gunshot wounds.

Trial evidence also reveals that after Jackson's murder, Thomas looked through a book of

photographs that Chicago Police Detectives brought to the home of Thomas' friend.  Thomas

identified a picture of Coleman as one of the offenders.  On the following day, Thomas and

Adamson identified Coleman in a lineup at a Chicago police station and made in-court

identifications of Coleman at his jury trial.

### D.      Probabilistic Determination

Under *Schlup* and *House*, the Court must assess the likely impact of Coleman's new

evidence on reasonable jurors.  *See House,* 547 U.S. at 538.  To do so, the Court must make a

"probabilistic determination of what reasonable, properly instructed jurors would do," *see*

*Schlup,* 513 U.S. at 329, in the context of all the evidence "old and new, incriminating and

exculpatory, without regard to whether it would necessarily be admitted under rules of

admissibility that would govern at trial."  *House,* 547 U.S. at 538.  As the *House* Court explains,

"[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry

requires the federal court to assess how reasonable jurors would react to the overall, newly

supplemented record.  If new evidence so requires, this may include consideration of 'the credibility of the witnesses presented at trial'" as well as the "likely crediblity of the [new] affiants."  *House,* 547 U.S. at 538-39; *Schlup,* 513 U.S. at 330, 332; *see also Bell v. Pierson,* 267 F.3d 544, 552 (7th Cir. 2001) ("*Schlup* requires the district court to consider the credibility of the petitioner's new evidence.").

Although Coleman presents evidence concerning several individuals, the quantity of his evidence is not matched by its quality.  Evelyn and Loretta Cade, for example, made their statements concerning Coleman approximately sixteen years after Coleman's jury trial, and as the Supreme Court instructs, the timing of the submission in support of an actual innocence claim is an important factor that the Court should assess.  *See House*, 547 U.S. at 537; *Schlup*, 513 U.S. at 331-32.  Moreover, Coleman admits that Loretta Cade had a bias to help him because she was his girlfriend.  (*See* R. 40-1, Supp. Habeas Pet., at 48.)  In addition, Loretta Cade and Coleman had a daughter together which explains Evelyn Cade's potential bias in protecting Coleman, who is the father of her grandchild.

Similarly, Barnes' affidavit – in which he stated that Wright was involved in Jackson's murder – is dated approximately eleven years after Coleman's trial and submitted only after Barnes had exhausted all of his appeals and post-conviction challenges in the Illinois courts.  *See People v. Coleman*, 1-95-4039, at 5.  The timing of Barnes' affidavit, however, is ameliorated by his defense counsel's affidavit stating that Barnes told him that Coleman was not involved in the offense at the time of the jury trial.  Nevertheless, evidence in the record reveals that Wright was the informant who gave Barnes' name to the police, thereby casting doubt on Barnes' statement that Wright was the perpetrator of the crime instead of Coleman.  *Id.* at 9.  Evidence also reveals

that Barnes stated that he was out of town on the day of Jackson's murder at his extradition hearing in Baltimore, Maryland and maintained his innocence in his affidavit attached to his post-conviction petition, yet testified at Coleman's post-conviction evidentiary hearing that he and Wright shot Jackson. *See People v. Coleman,* 179 Ill.App.3d 410, 434, 128 Ill.Dec. 401, 534 N.E.2d 583 (Ill.App.Ct. 1989); *People v. Coleman,* 1-95-4039, at 12-13. It is well-established that courts view recantation testimony with suspicion. *See United States v. Ogle,* 425 F.3d 471, 478 (7th Cir. 2005); *Dobbert v. Wainwright,* 468 U.S. 1231, 1233-34, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari). Accordingly, Barnes' averments are not trustworthy.

Finally, Coleman does not present affidavits by the Wilkins brothers, but instead relies upon counsels' affidavit filed with their motion to sever and a Chicago Police report. In the August 17, 1981 police report, the Wilkins brothers stated that they saw two black males sitting on the rear porch of Jackson's house. (R. 42-3, Ex. 4, Aug. 17, 1981, CPD Report, at 2). The brothers further stated that they saw the two men come and go several times before Jackson's shooting. (*Id.*) As discussed, counsel averred that after talking to the Wilkins brothers, they would testify that Barnes was one of the two men whom they saw outside of Jackson's home on the day of the murder, but that they did not see Coleman. (*See* R. 42-4, Ex. 10, Krull/Rhodes Aff.) From the record and the parties' arguments, it appears that the Wilkins brothers were disinterested witnesses. Nonetheless, without affidavits from the Wilkins brothers themselves, the probative force of this new evidence is not as compelling as the credible eyewitness testimony presented at trial, especially because the Wilkins brothers did not see the shooting.

Indeed, viewing the record as a whole, Coleman's new evidence is not convincing

14

enough to override the credible eyewitness testimony of Thomas and Adamson. *See Hayes,* 403 F.3d at 938 ("it is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar."); *see, e.g., Badelle v. Correll*, 452 F.3d 648, 661 (7th Cir. 2006) (actual innocence claim denied where petitioner was positively identified by two witnesses who spent time with him on day of murder). As the record reflects, Adamson witnessed the murder and Thomas was down the hall at the time of the murder. Also, Thomas identified Coleman in a photographic lineup and both Thomas and Adamson identified Coleman in a lineup at a Chicago police station and made in-court identifications of Coleman at his jury trial.[3] In contrast, the majority of the new evidence Coleman presents is based on unreliable witnesses and does not necessarily conflict with the testimony presented at trial.

In any event, although some of Coleman's new evidence is compelling, viewing this new evidence in tandem with the evidence presented at trial, the Court cannot conclude that no reasonable juror would convict Coleman of Jackson's murder and the attendant robbery. *See Schlup,* 513 U.S. at 327; *Hayes,* 403 F.3d at 938. Although Coleman has not demonstrated the actual innocence exception to procedural default under the *Schlup* standard, for the sake of completeness, the Court will address Coleman's procedurally defaulted ineffective assistance of counsel claims.

## II.     Ineffective Assistance of Counsel Claims – Merits Determination

The clearly established Supreme Court law that applies to Coleman's ineffective

---

[3] Coleman's counsel filed a pre-trial motion to suppress the lineup identification, which the trial court denied after conducting an evidentiary hearing. (*See* R. 42-3, Ex. 9, Aug. 31, 1982, Tr. at 124-31.) Coleman unsuccessfully challenged the allegedly suggestive lineup identification on direct appeal. *See People v. Coleman,* 179 Ill.App.3d 410, 432, 128 Ill.Dec. 401, 534 N.E.2d 583 (Ill.App.Ct. 1989).

assistance of counsel claims is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  To establish constitutionally ineffective assistance of counsel, Coleman must show that (1) his attorneys' performance "fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694 ("a reasonable probability is a probability sufficient to undermine confidence in the outcome"); *Suggs v. United States,* 513 F.3d 675, 678 (7th Cir. 2008).  If Coleman fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *See Strickland,* 466 U.S. at 697; *Amerson v. Farrey,* 492 F.3d 848, 851 (7th Cir. 2007).

Because Coleman did not give the Illinois Appellate Court the opportunity to consider his ineffective assistance of counsel claims, in reviewing Coleman's habeas claim, the Court must employ the general standard set forth in 28 U.S.C. § 2243 that requires the Court to "dispose of the matter as law and justice require," which is "a more liberal standard of review" than Section 2254(d)(1). *See Guest v. McCann,* 474 F.3d 926, 930-31 (7th Cir. 2007) (when no state court decision discussed merits, Section 2243 applies); *see also Stevens v. McBride,* 489 F.3d 883, 901 (7th Cir. 2007) ("As a practical matter, a federal court cannot apply the deferential standard provided by § 2254(d) in the absence of any state court decision on the issue.").  As the Seventh Circuit recently explained, "[e]ven when the claim is not subject to § 2254(d)(1) deference, a defendant must overcome the 'presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Johnson,* 518 F.3d at 457 (quoting *Strickland*, 466 U.S. at 689).  With these standards in mind, the Court turns to Coleman's ineffective assistance of counsel claims.

### A.     Motion to Sever Trial

First, Coleman argues that his trial counsel was constitutionally ineffective for failing to secure severance of his trial from his co-defendant Joseph Barnes' trial.  Coleman argues that without a separate trial, his trial counsel could not be expected to call the Wilkins brothers, who would testify favorably for him, but give inculpatory testimony concerning Barnes.  (*See* R. 40-1, Amend. Petition, Ex. 10.)  Although Coleman's and Barnes' counsel did move to sever this matter with an attached affidavit explaining their antagonistic defenses, Coleman argues that counsel was ineffective because the trial court denied the motion to sever.  (*Id.*, Ex. 9, "Motion for Severance" Tr., at 144-45, 172-73.)  Specifically, Coleman argues that counsel should have presented more evidence concerning the Wilkins brothers' testimony in order to secure severance from Barnes.

As the Seventh Circuit teaches, "under *Strickland,* our review of counsel's performance 'must be highly deferential' and 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  *Johnson,* 518 F.3d at 457 (quoting *Strickland,* 466 U.S. at 689.)  Coleman's argument that counsel should have done more to secure severance illustrates the *Strickland* Court's warnings about the distorting effects of hindsight.  Here, both Coleman's and Barnes' counsel moved to sever their jury trials and filed an affidavit in support of the co-defendants' antagonistic defenses.  They also carefully preserved this argument for appeal.  (*See* R. 40-1, Amend. Petition, Ex. 9, "Motion for Severance" Tr., at 144-45, 172-73.)  Meanwhile, Coleman fails to offer any suggestions on how counsel could have improved his chances of securing severance except that counsel should have submitted more

17

evidence supporting the motion.  Coleman's bare-boned argument does not establish that counsel's performance fell below an objective standard of reasonableness.  *See Strickland,* 466 U.S. at 688; *United States v. Turcotte,* 405 F.3d 515, 537 (7th Cir. 2005) (unsubstantiated and conclusory statements fall far short of carrying burden of persuasion as to *Strickland* claim).  In other words, counsel's conduct fell within the wide range of reasonable professional assistance.  *See Strickland,* 466 U.S. at 689.  Because Coleman failed in his burden of establishing the performance prong under *Strickland*, the Court need not examine *Strickland's* prejudice prong as to his ineffective assistance of counsel claim based on severance.  *See Strickland,* 466 U.S. at 697; *Amerson,* 492 F.3d at 851.

**B.       Failure to Call Witnesses to Offer Exculpatory and Alibi Evidence**

Further, Coleman argues that his trial counsel was constitutionally ineffective because counsel did not call the Wilkins brothers to testify that although they recognized Barnes at the scene of the crime, they did not identify Coleman as the other man with Barnes.  Coleman also argues that trial counsel was ineffective for failing to call Evelynn and Loretta Cade as alibi witnesses.

**1.       Exculpatory Evidence – Wilkins Brothers**

First, Coleman fails to overcome the presumption that counsel's decision not to call the Wilkins brothers at trial was a reasonable trial strategy.  *See Johnson,* 518 F.3d at 457-58.  As discussed, the Wilkins brothers were not eyewitnesses to the shooting.  Instead, they saw two men on the back porch of Jackson's house the day of the murder.  This testimony does not preclude the possibility that Coleman was involved in Jackson's murder, especially because the Wilkins brothers did not witness the actual murder.  *See U.S. ex rel. Emerson v. Gramley,* 902

18

F.Supp. 143, 147-48 (N.D. Ill. 1995).  Meanwhile, counsel presented the testimony of Dorothy

Davis who testified that she saw a car leaving the scene of the murder and that Coleman was not

one of the individuals in this car.  (Tr. 1675-76, 1684; Ex. 3, Aug. 12, 1981, CPD report, R. 40-1;

*People v. Coleman*, 1-95-4039, at 4-5.)  Because the Wilkins brothers' testimony was similar and

cumulative of Davis' testimony, counsel's decision not to call the Wilkins brothers as trial

witnesses does not establish that counsel's performance fell below an objective standard of

reasonableness.  *See United States v. Allender*, 62 F.3d 909, 914 (7th Cir. 1995).  Again, because

Coleman fails to make a proper showing under the *Strickland* performance prong concerning his

ineffective assistance claim based on the Wilkins brothers' testimony, the Court need not

consider the prejudice prong.  *See Strickland*, 466 U.S. at 697; *Amerson*, 492 F.3d at 851.

### 2.    Alibi Evidence – Evelyn and Loretta Cade

Next, Coleman's counsel made a reasonable strategic choice not to call Loretta or Evelyn

Cade as alibi witnesses, especially in light of their bias to protect Coleman because Loretta Cade

was Coleman's girlfriend and Evelyn Cade is the grandmother of Coleman's daughter.  *See*

*Johnson,* 518 F.3d at 457.  Put differently, counsel's decision not to present these alibi witnesses

did not constitute ineffective assistance of counsel because the Cades' testimony was unreliable

and not credible based on their relationships to Coleman.  *See id.; see, e.g., United States v.*

*Olson,* 846 F.2d 1103, 1109 (7th Cir. 1988).  Because Coleman has failed to overcome the

presumption that trial counsel's decision not to call the Cades as witnesses was sound trial

strategy, *see Johnson,* 518 F.3d at 457, the Court need not address *Strickland's* prejudice prong

under this last ineffective assistance of counsel claim.  *See Strickland,* 466 U.S. at 697.

### III.    Evidentiary Hearing

Finally, the Court addresses Coleman's request for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan,* 127 S.Ct. 1933, 1940 (2007). Federal habeas courts, however, are not an alternative forum for trying issues and facts that a habeas petitioner did not pursue at the state court level. *See Williams v. Taylor,* 529 U.S. 420, 432-34, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). As discussed above, Coleman did not pursue his ineffective assistance of counsel claims on post-conviction appeal nor does he argue or "establishe[] that he was diligent in his attempts to develop the factual record in the state court," obviating the need "to satisfy the remaining provisions of § 2254(e)(2) in order to obtain an evidentiary hearing." *Dalton v. Battaglia,* 402 F.3d 729, 736 (7th Cir. 2005) (citation omitted); *see also Price v. Thurmer,* 514 F.3d 729, 733-34 (7th Cir. 2008). Accordingly, the Court must turn to the dictates of Section 2254(e)(2).

Section 2254(e)(2) provides that, if a habeas petitioner failed to develop a factual basis for a claim in state court, the federal habeas court "shall not hold an evidentiary hearing on the claim" unless the habeas petitioner can show that:

(A) the claim relies on –

   (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

20

*See* 28 U.S.C. § 2254(e)(2).

Here, Coleman does not argue that there is a new rule of constitutional law that was previously unavailable or that there is a factual predicate that he could not have previously discovered through the exercise of due diligence, but instead argues that an evidentiary hearing is necessary for the Court to make factual findings and credibility determinations concerning his claims. *See Harris v. McAdory,* 334 F.3d 665, 670 (7th Cir. 2003). As discussed, under *Schlup* and *House*, the Court has the ability to make credibility determinations under the circumstances and no new factual findings are necessary to determine Coleman's ineffective assistance of counsel claims. *See House,* 547 U.S. at 537-39; *Schlup,* 513 U.S. at 330, 332. Because Coleman fails to establish that he was not at fault for the undeveloped state court record and fails to satisfy the conditions of Section 2254(e)(2), the Court, in its discretion, denies his request for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2). *See Schriro,* 127 S.Ct. at 1940 (decision to grant evidentiary hearing under Section 2254(e)(2) rests in the discretion of the district court).

## CONCLUSION

For these reasons, the Court denies Coleman's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1).

Dated: August 28, 2008

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**

21