**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES ex rel. MAURICE COLEMAN (#A25160), | ) ) ) | |
| Petitioner, | ) ) | |
| | ) | Case No. 99 C 2635 |
| v. | ) ) | |
| MARCUS HARDY, Warden, Stateville Correctional Center, | ) ) ) | |
| Respondent. | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

On August 28, 2008, the Court denied Petitioner Maurice Coleman's petition for a writ of habeas corpus and supplemental habeas petition pursuant to 28 U.S.C. § 2254(d).[1]  On November 19, 2010, the Seventh Circuit remanded this matter to the Court to conduct an evidentiary hearing on Coleman's claim of actual innocence, which is a gateway for the Court to review the merits of Coleman's procedurally defaulted Sixth Amendment ineffective assistance of counsel claims.  *See Coleman v. Hardy,* 628 F.3d 314, 319 (7th Cir. 2010).  On remand, after the parties conducted discovery, the Court held an evidentiary hearing on August 22 and 23, 2011.  The parties completed their post-hearing briefing on December 19, 2011.  In light of the testimony and documentary evidence, along with the Court's credibility determinations, the Court denies Coleman's petition for a writ of habeas corpus.  *See* 28 U.S.C. § 2254(d).  The Court also declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

---

[1] On July 2, 2008, the Executive Committee for the Northern District of Illinois reassigned Coleman's habeas petition to this Court pursuant to Rule 13 of the Internal Operating Procedures.  (R. 56.)

**BACKGROUND**

I.      **Factual Background**

The Court first turns to a summary of the evidence presented at Coleman's jury trial as determined by the Illinois Appellate Court, which the Court presumes as correct for purposes of its habeas review.  *See* 28 U.S.C. § 2254(e)(1).  Testimony from Coleman's 1983 criminal trial shows that on Sunday, August 2, 1981 at about 5:00 p.m., the victim, Terrell Jackson, age 33, was at his home on the south side of Chicago and was asleep on the floor in a second floor bedroom.  Jackson's stepdaughter, Gwen Thomas, age 19, was in another second floor bedroom with her newborn baby.  At that time, Jackson's younger brother, Arlander Adamson, age 18, was watching television in the first floor living room.  That same day, two men carrying guns burst through the rear door of Jackson's home.  The men put their guns to Adamson's head and ordered him to tell them who was in the house.  Adamson then told them that his brother, his niece, and her baby were upstairs.  The men also asked Adamson if there were any drugs or money in the house.  They then bound and gagged Adamson forcing him to accompany them upstairs.

Once upstairs, Adamson indicated to the men that his niece and her baby were in the room where the door was closed.  The men, along with Adamson, went down the hallway to Jackson's bedroom, after which the men ordered Adamson to lie on the floor.  They told Jackson to get up and asked him, "Where is the s--t at?"  As Jackson awakened, the men fired five or six shots at him.  One of the men took Jackson's jewelry and money and the other looked through various drawers in the room while asking, "Where's the s--t?"

One of the men then left Jackson's room and went to Thomas' room, and – with a gun in

his hand – told Thomas to come with him. He then directed Thomas to Jackson's room. Thomas testified that she saw Jackson and Adamson lying on the floor. One of the men told Thomas that if she did not tell them where "it" was, the two men would kill them. Thomas then asked Jackson what the men wanted and where "it" was. Jackson said that he did not have anything and that he did not want to die. Nonetheless, the two men ransacked the room, went into the closets and under the mattress, and pulled out drawers. One of the men put something in his pocket. They also tied up Thomas and made her lie face down on the floor and one of the intruders took a necklace from Thomas' neck. They then left Jackson's home.

Shortly thereafter, Thomas and Adamson untied each other. Thomas went downstairs, locked the doors, and then called the police, her grandmother, and her cousin, Dorothy Davis, while Adamson held Jackson, who was dying. Jackson then died from his gunshot wounds. After the police arrived, Adamson and Thomas described the two offenders. Later that evening, Adamson and Thomas looked through photograph books at the police station, but neither one made an identification of the perpetrators. A few weeks later on August 18, 1981, Thomas looked through a book of photographs that Chicago Police Detectives brought to the home of Thomas' friend. Thomas identified a picture of Coleman as one of the offenders. On the following day, Thomas and Adamson identified Coleman in a lineup at a Chicago police station.

On August 28, 1981, Chicago police showed Adamson a group of photographs and he identified Joseph Barnes as the other offender. After the police charged Barnes with the August 2, 1981 robbery-murder, the Circuit Court of Cook County issued a warrant for Barnes' arrest. On September 12, 1981, Baltimore, Maryland police arrested Barnes. After extradition proceedings, Barnes was extradited to Chicago on February 17, 1982, and on that date, Thomas

and Adamson identified Barnes in a lineup as the other offender who invaded their home and

killed Jackson on August 2, 1981.  Adamson and Thomas also identified Coleman and Barnes at

the 1983 criminal trial as the two assailants who intruded into their home, robbed them, and

killed Jackson.

## II.    Procedural Background

In 1983, a jury in the Circuit Court of Cook County found Coleman and Barnes guilty of

murder and armed robbery.  Although the State sought the death penalty, the trial judge

sentenced Coleman to prison terms of natural life and thirty years' imprisonment, respectively.

Coleman appealed his judgment of conviction to the Illinois Appellate Court, First District,

arguing that:  (1) improper identification evidence was obtained in violation of his Sixth

Amendment right to counsel and was wrongly used at trial; (2) his Sixth Amendment right to a

jury composed of a cross-section of the community was denied because the trial court excluded

all persons who were unalterably opposed to the imposition of the death penalty; (3) the trial

court erred in admitting the State's rebuttal testimony to Barnes' alibi witness; (4) cumulative

prosecutorial error denied him a fair trial; and (5) the trial court failed to properly exercise its

discretion by summarily denying the jury's request for a transcript of witness testimony.  On

February 3, 1989, the Illinois Appellate Court affirmed Coleman's conviction and sentence.

On April 6, 1989, Coleman filed a petition for leave to appeal ("PLA") to the Supreme

Court of Illinois, raising three claims:  (1) improper identification evidence was obtained in

violation of his Sixth Amendment right to counsel and wrongly used at trial; (2) cumulative

prosecutorial error denied him a fair trial; and (3) the trial court failed to properly exercise its

discretion by summarily denying the jury's request for a transcript of witness testimony.  On

June 1, 1989, the Supreme Court of Illinois denied Coleman's PLA.

On March 1, 1990, Coleman filed a pro se petition for post-conviction relief in the Circuit Court of Cook County pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.,* arguing that trial counsel was constitutionally ineffective for failing to call Tracey and David Wilkins to testify. On September 23, 1992, Coleman filed a pro se supplemental amendment to his post-conviction petition arguing that trial counsel was constitutionally ineffective for failing to call Evelynn Cade and Loretta Cade, a witness identified as "Sleepy," and Roy Wright as trial witnesses, along with counsel's failure to call Tracey and David Wilkins. On August 9, 1994, Coleman, by counsel, filed an amended post-conviction petition alleging that Barnes admitted that Coleman was not involved in the underlying crimes and that Barnes' admission was corroborated by other evidence proving that Coleman was wrongly convicted. In particular, Coleman asked for a new trial based on his actual innocence pursuant to *People v. Washington,* 256 Ill.App.3d 445, 447-48, 195 Ill.Dec. 94, 628 N.E.2d 558 (1st Dist. 1993), an appellate opinion that the Supreme Court of Illinois later affirmed.[2] After granting Coleman an evidentiary hearing in which Coleman's co-defendant

---

[2] Unlike federal habeas claims, Illinois courts recognize actual innocence claims as free standing claims based on the Illinois Constitution. *Compare Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits"), *with People v. Washington,* 171 Ill.2d 475, 489, 216 Ill.Dec. 773, 665 N.E.2d 1330 (Ill. 1996) ("We therefore hold as a matter of Illinois constitutional jurisprudence that a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process."). The Supreme Court of Illinois' decision in *Washington,* however, post-dated Coleman's August 1995 post-conviction hearing and the Circuit Court's denial of Coleman's post-conviction petition by approximately seven months. In Coleman's counseled post-conviction appeal, he argued that he was actually innocent under the Supreme Court of Illinois' opinion in *Washington* and the Illinois Appellate Court followed the 1996 *Washington*

Barnes testified, the post-conviction Circuit Court denied Coleman's amended post-conviction

petition finding Barnes' testimony incredible and that his friendship with Coleman was a strong

motivation for him to testify favorably for Coleman. The Circuit Court also concluded that

revenge was a powerful motivating factor for Barnes substituting Roy Wright as his accomplice

instead of Coleman. In sum, the Circuit Court concluded that Barnes' testimony "so lacks

credibility and lacks credibility to the extent that the outcome of this case would probably not be

different if Barnes was a witness, in the past trial or would be a witness in a future trial." *See*

*People v. Coleman,* No. 1-95-4039, at *9-10 (1st Dist. July 31, 1998) (unpublished).

Coleman appealed the Circuit Court's denial of his post-conviction petition to the Illinois

Appellate Court arguing that the trial court abused its discretion in denying his amended post-

conviction petition because Barnes' exculpatory statement was unavailable at trial and would

have proven his innocence if introduced at a new trial. Coleman, however, did not argue that his

trial counsel was constitutionally ineffective on post-conviction appeal. On July 31, 1998, the

Illinois Appellate Court affirmed the Circuit Court's denial of Coleman's amended post-

conviction petition. In its July 1998 decision, the Illinois Appellate Court explained Coleman's

post-conviction petition and the evidence in support of the petition, including the August 1995

post-conviction hearing evidence:

> Defendant's amended [post-conviction] petition alleged that the newly
> discovered evidence consisted of a statement by Barnes that he was involved in
> the offense with Roy Wright and Barnett Hall (a drug dealer who is now
> deceased), and not with defendant. This statement was supported by Barnes'
> affidavit, which described how the offense was committed. An affidavit of
> Barnes' trial counsel, James Rhodes, indicated that Barnes told him during the

---

holding when evaluating Coleman's actual innocence based on newly discovered evidence. *See*
*People v. Coleman,* No. 1-95-4039, at *10-11 (1st Dist. July 31, 1998) (unpublished).

jury's deliberation that defendant did not have anything to do with the crime. In corroboration, an affidavit from Isaac Smith, an inmate at Menard prison, stated that he was present in July or August 1994, when Wright told defendant in the prison yard that he knew defendant was not involved in the murder.

Also attached to defendant's [post-conviction] petition was certain correspondence between defendant and his appellate counsel in which he conveyed to counsel that Wright could exonerate him. This correspondence did not mention a prison yard conversation with Isaac Smith. Defendant stated that in August 1994 Wright sent word to him that he wanted to talk about his conviction. When they talked in October 1994, Wright allegedly told defendant he would be willing to prepare a statement for him and defendant's counsel affirming defendant's innocence. When defendant told counsel about this October-1994 conversation with Wright, he mentioned Wright's refusal to help Barnes because Barnes owed him money. Although copies of correspondence from defendant's counsel to Wright are attached, no statement from Wright was ever submitted to counsel or defendant.

An affidavit of Geary Kull, defendant's trial attorney, stated that on one occasion he tried to speak to Wright about this case, but Wright refused to talk to him.

...

A statement was prepared at the time of trial (dated April 21, 1983) and signed by both defense attorneys indicated that neighbors of the decease, the two Wilkins brothers, saw two men enter the deceased's home about the time of the shooting. The Wilkins brothers could identify Barnes, but could not identify defendant. Affidavits of defense investigators documented a short conversation with Adamson in which he told them that the victim was a drug dealer and when the robbers asked where "it" was at, they meant [] $10,000.

...

At the evidentiary hearing, Barnes testified that if defendant was granted a new trial, Barnes would testify on defendant's behalf and that he understood such testimony would be used against him if he were ever granted a new trial. It was then brought out that Barnes had exhausted all appeals and post-conviction challenges, except for a petition of habeas corpus. Barnes testified that defendant did not plan or participate in the murder, was not present during the shooting and was not responsible for the conduct of Barnes, Wright, and Hall.

Barnes testified that he and Roy Wright shot the victim during a dispute over a drug deal. Barnes and Hall had a prior business relationship dealing drugs. In this instance, Barnes gave Hall $10,000 so Hall could purchase drugs from the victim through Wright. After Hall gave Wright the money, bad drugs were delivered. When Barnes' request for the return of his money was denied, Wright

7

took Barnes and Hall to see the victim. When the victim pulled out a gun and refused to produce drugs or money, both Barnes and Wright repeatedly shot [the] victim.

...

In 1980, Barnes was imprisoned and he placed defendant's name on his visiting list of friends. He explained that he did this only because defendant had agreed to drive Barnes' wife to visit him. He said if defendant's name had not been included, defendant would have had to wait outside in his car while Barnes visited with his wife. Defendant never visited Barnes in prison. Barnes insisted defendant was not his friend, but that he was "an okay guy."

Barnes waived his attorney-client privilege and testified that during the jury's deliberation, he told his attorney that the reason he kept asking Rhodes for a severance was because "that guy [defendant] had nothing to do with it [the murder]." Barnes told Rhodes that Wright, whom he called by his street name, committed the murder with him. Barnes testified that it would have been a shame if the jury had convicted defendant, "because he [defendant] had nothing to do with it." Barnes said that when Rhodes asked him how he knew defendant was not involved, he told him, "Because I was there." Barnes admitted lying in his post-conviction petition. He testified that Rhodes did not refuse to allow him to testify during trial as alleged in the petition, but that he merely recommended that he not testify. He also testified that everything to which Adamson testified at trial was a lie and did not happen, but he did not know why Adamson would lie. Barnes testified that he was now acknowledging his participation in this matter for his own peace of mind.

On cross-examination, Barnes admitted that during his extradition hearing on this case in Baltimore, Maryland, he testified that he was in Baltimore at the time of the murder. He explained his perjury by stating, "I didn't want on [sic] be in Chicago." At trial, Barnes presented a different alibi supported by the testimony of his wife and another relative that he was home in Chicago with his family at the time of his murder. Barnes also admitted lying in his affidavit which accompanied his post-conviction petition.

During the evidentiary hearing, Barnes testified that he shot the victim, but stated that he acted in self-defense. He stated that the gun used by the victim was recovered under the mattress in the bedroom where the victim was found. On cross-examination, Barnes admitted he felt a "little bitterness" toward Wright because Wright was the informant who gave his name to the police, but it was nothing he could not "get over."

James Rhodes, Barnes' trial attorney, testified that although a severance was requested before trial, it was denied. When he presented Barnes' alibi

defense, he was aware of Barnes' testimony during the extradition hearing in Maryland and therefore only presented the alibi witnesses provided by Barnes. Barnes first discussed defendant with him when the jury was deliberating. At that time, Barnes told Rhodes in the lockup that "he felt pretty bad for defendant because defendant really didn't have anything to do with it [the murder]." At that time, Barnes did not tell Rhodes he was involved in the offense or provide other details regarding the offense. Rhodes did not ask Barnes whether he was involved or how he knew defendant was not involved. At that time, Barnes never told Rhodes that he wanted to testify at trial and make a claim of self-defense. Rhodes testified that he never directly asked Barnes or any other client whether he committed the offense.

See *Coleman,* No. 1-95-4039, at *2-8. Based on the post-conviction Illinois Appellate Court's examination of the record, including the 1995 hearing testimony, the appellate court concluded:

> [T]he trial court's credibility assessment was not against the manifest weight of the evidence. Codefendant Barnes presented three different defenses during separate sworn proceedings. At his extradition hearing in Baltimore, Maryland, he testified that he was in Baltimore at the time of the murder. At trial, his attorney presented an alibi defense that he was at home in Chicago with his family at the time of the murder. Although Barnes maintained his innocence in the affidavit attached to his post-conviction petition, his testimony during the evidentiary hearing on defendant's post-conviction petition admitted his presence and asserted self-defense. Furthermore, Barnes identified Wright, the person who implicated him in this offense, as his accomplice.

> Also, Barnes' testimony differed in major respects from that of Rhodes, his trial attorney and the only other witness at the evidentiary hearing. Rhodes stated that during the jury's deliberation Barnes told him that defendant was not involved, but did not tell him anything more. However, Barnes testified that he told Rhodes that he was there, and that Wright was involved with him. Rhodes testified that he never asked Barnes how he knew that defendant was not involved. Additionally, Barnes admitted that Rhodes did not prevent him from testifying at trial as he had previously alleged in the affidavit attached to his earlier-filed petition for post-conviction relief.

> Barnes' recent testimony exonerating defendant, inculpating himself and claiming self-defense contains no indicia of reliability. We do not believe that it is of such a conclusive nature that it would probably change the result on retrial.

See *Coleman,* No. 1-95-4039, at *12-13.

Thereafter, on August 7, 1998, Coleman filed a notice of intent to file a post-conviction

PLA to the Supreme Court of Illinois. In his post-conviction PLA, Coleman raised one issue, namely, that the trial court erred in denying his amended post-conviction petition because Barnes' testimony would have exonerated him. Coleman did not present any ineffective assistance of trial counsel claims in his post-conviction PLA. The Supreme Court of Illinois denied Coleman's post-conviction PLA on December 2, 1998.

## III.   Prior Habeas Rulings

### A.   District Court

Prior to the Court's August 28, 2008 ruling on Coleman's habeas petition, his counsel admitted that Coleman had procedurally defaulted his ineffective assistance of counsel claims because Coleman had failed to present them in one complete round of review to the Illinois state courts. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). Counsel, however, argued that the miscarriage of justice exception based on Coleman's actual innocence excepted Coleman's procedural default. *See House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The Court determined that Coleman had not met the actual innocence standard, but nevertheless discussed Coleman's ineffective assistance of counsel claims on the merits concluding that Coleman had not fulfilled the clearly established standard under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### B.   Seventh Circuit

On March 12, 2009, the Seventh Circuit granted Coleman's request for a certificate of appealability as to the following issues: (1) whether new evidence not presented at trial supports his claim of actual innocence; and (2) whether trial counsel was constitutionally ineffective. On November 30, 2010, the Seventh Circuit remanded this matter for an evidentiary hearing for the

10

Court to evaluate Coleman's actual innocence claim, and if that threshold was met, to determine Coleman's ineffective assistance of counsel claim.

On remand, after the parties conducted discovery, the Court held an evidentiary hearing on August 22 and 23, 2011. In addition to submitting documentary evidence, the parties called the following individuals as witnesses: Joseph Barnes, James Rhodes, Loretta Cade, Geary Kull, Roy Wright, Gwen Thomas Jackson, and Maurice Coleman. The parties completed their post-hearing briefing on December 19, 2011.

## ANALYSIS

### I. Actual Innocence

#### A. Legal Standard

When a petitioner asserts actual innocence as a gateway for a federal habeas court to review the merits of his procedurally defaulted claims, the petitioner must show that "in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House,* 547 U.S. at 537 (internal quotation and citation omitted); *Morales v. Johnson,* 659 F.3d 588, 605 (7th Cir. 2011). A petitioner must support his actual innocence allegations "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Further, the Court must consider all of the evidence "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," to determine if "it was more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House,* 547 U.S. at 537 (quotations omitted). "Although a

11

claim of actual innocence is 'rarely successful,' an absolute certainty about a petitioner's guilt or innocence is not required to satisfy the petitioner's burden at the gateway stage." *Coleman,* 628 F.3d at 319 (internal citation omitted).

### B.    New Evidence

#### 1.    Barnes and Rhodes

The Court first addresses the two pieces of new evidence that the Seventh Circuit discussed in detail in its opinion, namely, the affidavits of Joseph Barnes, Coleman's co-defendant, and the affidavit of James Rhodes, Barnes' criminal defense attorney. *See Coleman*, 628 F.3d at 320.  The Seventh Circuit summarized Barnes' affidavit and Illinois post-conviction hearing testimony as follows:

> In Barnes's affidavit, Barnes asserts that his co-defendant should have been Roy Wright, and that the murder was related to a bad drug deal.  According to Barnes, he had not met Terrell Jackson before the evening of Jackson's murder because the drug deal had been set up using Wright and a man named Barnett Hall as middlemen.  Barnes stated that he had expected drugs that could be "re-cut" several times as a way of increasing his profit, but when he received Jackson's drugs, he was disappointed by their lack of quality.  He stated that he wanted either a better product or his money back, and so he told Wright to get in touch with Jackson.  Wright could not reach Jackson and wanted more time to try to talk to him, but eventually Wright and Barnes went to Jackson's house, where the murder occurred.  In Barnes's testimony at the 1985 state post-conviction hearing,[3] most of this version of events had been the same, but there is one significant difference.  At the post-conviction hearing, Barnes testified that Barnett Hall came into Jackson's house during the night of the murder as well, and that Hall got shot in the ensuing fight.  There is no corroborating evidence of a third offender being present, and Hall did not testify to any of these events as he died before the 1985 hearing.

*Id.*

---

[3] Barnes testified at Coleman's Illinois post-conviction hearing on August 1, 1995 and his affidavit is dated May 23, 1994.  (R. 165, Hr'g Tr. at 195; R. 151, Pet. Ex. 12.)

At the August 2011 habeas evidentiary hearing, Barnes testified that Coleman was not involved in the shooting death of Terrell Jackson in 1981. (R. 165, Hr'g Tr. at 196.) Further, Barnes testified that he knew Coleman at the time of Jackson's murder because they lived in the same neighborhood. (*Id*. at 208.) Barnes explained that Barnett Hall, Roy Wright, and he were involved in Jackson's murder after purchasing some narcotics from Jackson. (*Id*. at 197.) Also, Barnes testified that after Hall, Wright, and he discovered that the narcotics were "garbage," Wright said that he would "take care of it," by suggesting that Hall, Barnes, and Wright go talk to Jackson at his house. (*Id*. 198-202.) A day or two after this conversation, these individuals went to Jackson's home. (*Id.* at 203.) Barnes testified that two other people were at Jackson's home besides Jackson, and that Hall, Wright, and he went upstairs to find Jackson. (*Id.* at 204.) According to Barnes, when they found Jackson upstairs, he was watching television. (*Id*.) At that time, Hall told Jackson they wanted their money back. (*Id.* at 205.) Barnes testified that Hall, Wright, and he were carrying weapons and that as Jackson was getting up, it looked like he had something in his hand, so they started shooting at him. (*Id*. at 206-07.) He then explained that Hall was also shot. (*Id*.) Barnes testified that they then left Jackson's house and drove away in Hall's car. (*Id*. at 207-08.) Shortly thereafter, Barnes went to Baltimore, Maryland where he was arrested for Jackson's murder. (*Id.* at 210-11.) At Barnes' 1983 murder trial, James Rhodes represented him. (*Id*. at 210.) Barnes testified that he had a conversation with Rhodes telling Rhodes that Coleman, his co-defendant, had nothing to do with Jackson's murder. (*Id*. at 211-12.)

Barnes' testimony that he told his defense attorney – then assistant public defender James Rhodes – that Coleman had nothing to do with Jackson's murder is corroborated by Rhodes'

1994 affidavit, Rhodes testimony at the 1995 Illinois post-conviction evidentiary hearing, and Rhodes' August 2011 habeas hearing testimony. Specifically, in his December 13, 1994 affidavit, Rhodes averred that during the joint trial of Barnes and Coleman, Barnes told him that Coleman had nothing to do with Jackson's murder. (R. 151, Ex. 13, Rhodes Aff. ¶ 4.) Rhodes explained that the attorney-client privilege protected this information at that time. (*Id.*) Further, Rhodes stated that after the jury verdict, Barnes expressed dismay that the jury had convicted Coleman. (*Id.* ¶ 5.) Rhodes also averred that in 1994, Coleman's post-conviction lawyer approached Rhodes and Barnes to submit affidavits regarding Coleman's actual innocence claim, after which Barnes waived his right to the attorney-client privilege and allowed Rhodes to submit his 1994 affidavit. (*Id.* ¶¶ 7-12.)

At the August 2011 habeas hearing, Rhodes, who is presently a Cook County Circuit Court Judge, testified that Barnes was one of his clients and that he represented him at his 1983 murder trial. (R. 165, Hr'g Tr. at 166-67.) He further testified that Coleman's post-conviction attorney called him to submit an affidavit as part of Coleman's post-conviction petition. (*Id.* at 174.) Rhodes then clarified that Barnes made the statement that Coleman was innocent while the jury was deliberating during the 1983 criminal trial. (*Id.* at 177.)

### 2. Evelynn and Loretta Cade

Although Coleman did not submit the affidavits of Evelynn Cade, now deceased, and her daughter Loretta Cade in support of his actual innocence claim to the Illinois courts, he submitted these affidavits in support of his habeas petition, and the Seventh Circuit directed the Court to evaluate the Cades as potential alibi witnesses on remand. *See Coleman,* 628 F.3d at 321. In her July 8, 2000 affidavit – that the Court considered in its 2008 habeas ruling – Loretta

14

Cade averred that Coleman was with her and their daughter on August 2, 1981, the day of Jackson's murder.  (R. 152-3, Ex. 16, L. Cade Aff.)  Loretta Cade also averred that she told Coleman's attorney, Geary Kull, that Coleman was at her mother's house on the day of Jackson's murder and that Kull said he would call her as a witness at Coleman's trial, but that Kull never called her back.  (*Id*.)  Likewise, in Evelynn Cade's January 9, 1999 affidavit, she averred that around the time of Jackson's murder, she was out of town and left her daughter Loretta Cade at home to watch her house.  (R. 152-3, Ex. 17, E. Cade Aff.)  Evelynn Cade further averred that she talked to Coleman, who was at her home with Loretta Cade, on the telephone on August 2, 1981, at around 5:00 p.m. or 5:15 p.m. for fifteen minutes.  (*Id*.)  She stated that she remembered she had called on August 2, 1981 because August 3 was her birthday. (*Id*.)

Loretta Cade also testified at the August 2011 habeas evidentiary hearing stating that Coleman was her daughter's father.  (R. 166, Hr'g Tr. at 304.)  Loretta Cade specifically testified that in 1981 her daughter, Shavon Coleman, and she lived with her mother Evelynn Cade and father Fred Cade at 6548 South Eberhart in Chicago.  (*Id*.)  Further, Loretta Cade stated that her parents had been on vacation the day of Jackson's murder and that Coleman was staying with her at her parents' home during that time period.  (*Id*. at 314.)  She recounted that Coleman, Shavon, and she did not go anywhere that day, and that her mother called them in the evening on August 2, 1981.  (*Id*. at 315.)  Loretta Cade also remembered the day that Coleman was arrested and that she had met with Coleman's attorney prior to Coleman's criminal trial.  (*Id*. at 307-09.)  In addition, Loretta Cade testified regarding her 2000 affidavit in which she said that she had talked to Coleman's attorney, Geary Kull, in the first part of 1982 and told him that Coleman, her

15

daughter, and she were at her parent's house on August 2, 1981. (*Id*. at 309-12.) Loretta Cade testified that Coleman's attorney said he would notify her about Coleman's trial, but that he never did. (*Id*. at 313.) She also stated that she never refused to come to court and that no police officers or investigators ever spoke to her. (*Id*. at 316.) Loretta Cade testified that her mother never met with Coleman's attorney and that the attorney never visited their home. (*Id*. at 317.)

On cross-examination at the August 2011 evidentiary hearing, Loretta Cade testified that Coleman, her daughter, and she never left the house during the entire time her parents were on vacation in July and August 1981. (*Id*. at 337-38.) She further stated that she was with Coleman when he was arrested on August 18 or 19, 1981. (*Id*. at 341-42.) Loretta Cade said that she could not remember whether she visited Coleman at the Cook County Jail or talked to him on the telephone after his arrest, but she did remember that she did not attend Coleman's trial. (*Id*. at 306-07, 342.) She stated that she did not know what was going on regarding Coleman's trial and that she had to move on with her life. (*Id*. at 357-58.) Loretta Cade, however, also admitted that she never saw Coleman again after he was arrested in August 1981. (*Id*. at 307.)

### 3.    Geary Kull

Coleman's criminal defense attorney, Geary Kull, also testified at the August 2011 habeas evidentiary hearing. Kull, who is presently a Cook County Circuit Court Judge, explained that he had worked for the Cook County Public Defender's Office from 1974 until 1982 and had tried at least 50 murder trials by then. (R. 165, Hr'g Tr. at 17, 21.) After Kull started his private practice in 1982, Coleman's family retained him to represent Coleman in his criminal trial. (*Id*. at 21-22.) Kull also testified that after Coleman's family ran out of money, the Circuit Court appointed him to represent Coleman on December 3, 1982. (*Id*. at 22.)

Furthermore, Kull explained that Coleman told him that he was at his girlfriend's house at the time of Jackson's murder and that thereafter Kull interviewed both Loretta Cade and Evelynn Cade at their home because Kull anticipated calling them at trial as part of Coleman's alibi defense. (*Id*. at 35-38.) Kull specifically testified that when he visited Evelynn and Loretta Cade at their home, they told him they were not interested in testifying, they did not want to be involved, and that they did not remember whether Coleman was at their home on August 2, 1981. (*Id*. at 39-41.) Kull then told Coleman that the Cades were unwilling to support his alibi defense. (*Id*. at 42.) Kull testified that Coleman was not surprised by the Cades' unwillingness to cooperate. (*Id*.) Further, Kull explained that he did not call the Cades as alibi witnesses because he was not going to put hostile or antagonistic witnesses on the stand and that he thought their alibis were faulty. (*Id.* at 103-04.)

Otherwise, Kull testified that he believed that the jury should have acquitted Coleman because the State only presented two eyewitnesses, including Adamson, who Kull impeached numerous times with prior inconsistent statements. (*Id*. at 44-46.) Kull also testified that he believed that Thomas' trial testimony was inconsistent with Adamson's testimony, including the description of the perpetrators. (*Id*. at 46-47.) Kull recounted that the State never tied Coleman to Barnes and that the case lacked any corroboration for why Coleman would commit the crimes. (*Id*. at 47.) In addition, Kull testified that the State did not present any forensic evidence linking Coleman to the murder. (*Id.* at 48.)

Kull then testified about potential witnesses David and Tracey Wilkins – to whom he referred to as the "Wilkins brothers." (*Id*. at 50.) Kull recalled that David Wilkins was on the back porch of his house near Jackson's home and that Tracey Wilkins was at a laundromat down

17

the street at the time in question.  (*Id*. at 50-51.)  Both brothers witnessed people around or leaving the Jackson home on August 2, 1981 and could identify Barnes as one of those individuals, but they could not identify Coleman as one of the individuals.  (*Id*. at 51-52, 54.) Kull and Rhodes interviewed the Wilkins brothers at which time they showed them photographs of both Barnes and Coleman.  (*Id*. at 54.)  Kull remembered that neither Tracey nor David Wilkins could identify Coleman.  (*Id*. at 54-55.)  Kull also stated that after they interviewed the Wilkins brothers, Rhodes and he decided to move to sever the criminal trial because it was in their clients' best interest.  (*Id*. at 57-58.)  Kull then explained that David Wilkins' failure to identify Coleman was brought out at Coleman's criminal trial by a police officer who testified that he took David Wilkins to Coleman's lineup at which time David Wilkins was unable to identify Coleman.  (*Id*. at 60.)

Further, Kull explained that he objected to the joinder of Barnes and Coleman from the very beginning of his representation.  (*Id*.)  He thought Coleman would be in a much better position if tried alone due to Barnes' and Coleman's different defenses.  (*Id*. at 60-61.)  Kull also commented that he thought Barnes' alibi defense was weak and that it could cause "prejudicial spillover" to Coleman.  (*Id*. at 64.)  Accordingly, Rhodes and Kull filed a motion to sever in December 1982.  (*Id*. at 65.)  In April 1983, Rhodes and Kull renewed their motion to sever in camera, ex parte after which the attorneys put their reasons for the severance under seal.  (*Id*. at 65-66.)  Kull explained that by putting the information under seal, they preserved the argument and record for appeal.  (*Id*. at 67.)  Also, Kull testified that he did not want to disclose the information that the Wilkins brothers could put Barnes at the scene of the crime because the State may have used it and such evidence would add credibility to Adamson's and Thomas'

18

eyewitness testimony implicating Coleman.  (*Id*. at 68-71.)  The trial judge denied the motions

for severance.

### 4.        The Wilkins Brothers

In support of his habeas petition, Coleman did not present affidavits by the Wilkins

brothers, but instead relied upon Rhodes' and Kull's April 21, 1983 affidavit filed with their joint

motion to sever, as well as a police report.  In the August 17, 1981 police report, the Wilkins

brothers stated that they saw two black males sitting on the rear porch of Jackson's house.  (R.

147, Ex. 4, Aug. 17, 1981, CPD Report, at 2).  The Wilkins brothers further told the police that

they saw two men come and go several times before Jackson's shooting, but neither brother

could identify the two offenders.  (*Id*.)  As Kull and Rhodes averred in their April 21, 1983 joint

affidavit:

> Through conversations held with Tracey and Daniel Wilkins it has become
> evident that one or both of those individuals will be called by defendant Coleman
> in presenting his defense.  These two individuals would testify that defendant
> Coleman was not one of the two men they saw outside of the home of the victim
> at the time of the shooting.  It also appears that if questioned by the state as to
> their ability to identify defendant Barnes, they would be able to do so.

(R. 151, Ex. 11, Krull/Rhodes Aff.)

Neither Tracey nor Daniel Wilkins testified at the August 2011 habeas evidentiary

hearing.  Barnes' attorney Rhodes, however, testified about the motion to sever and the Wilkins

brothers' interview.  Rhodes related that Kull and he had interviewed Tracey and David Wilkins

while preparing for Coleman's and Barnes' criminal trial.  (R. 165, Hr'g Tr. at 167-68.)  Rhodes

stated that during the interview, the Wilkins brothers identified Barnes as one of the individuals

they saw outside of Jackson's home, but that they could not identify the other person whom they

saw.  (*Id*. at 169-70.)  Furthermore, Rhodes testified that Kull and he then filed a joint motion to

sever the trial because the Wilkins brothers would testify against his client Barnes. (*Id*. at 170-71.) Rhodes also stated that when he moved to sever, he anticipated that either the State or Kull would call the Wilkins brothers at trial. (*Id*. at 171-72.) Last, Rhodes testified that he did not think the Wilkins brothers lied about their eyewitness testimony during their interview. (*Id*. at 171.)

### 5. Roy Wright

Roy Wright, who Barnes implicated in Jackson's murder, also testified at the August 2011 habeas hearing. Wright specifically testified that he had been convicted for possession of a controlled substance and had recently been released from custody. (R. 166, Hr'g Tr. at 365.) Wright also testified that in 1981 he lived at 69th Street and Calumet Avenue in Chicago and that he had known Terrell Jackson for about six years at that time. (*Id*. at 366-67.) He admitted that Jackson and he had a business relationship selling heroin and that Jackson was his supplier. (*Id*. at 367-68.) Wright then explained their drug transactions, namely, that someone would order drugs and he would let Jackson know, after which Wright would pick the drugs up from Jackson. (*Id*. at 368-69.) As such, Wright had been to Jackson's home on numerous occasions throughout 1980 and 1981. (*Id*. at 370-71.) Further, Wright testified that he knew Adamson, Jackson's brother, and would see him at Jackson's home on occasion. (*Id*. at 371.) Wright knew Thomas, Jackson's niece, and explained that Thomas lived at Jackson's home in 1981. (*Id*. at 372.) Wright, however, denied that he had a romantic relationship with Thomas. (*Id*. at 373.) Also, Wright testified that he did not know Barnes until August 1981, but that he knew Coleman because they went to the same grade school. (*Id*. at 373-74.) Wright explained that he introduced Coleman to Jackson in 1980, that Coleman bought heroin from Jackson, and that

Wright arranged the drug transactions.  (*Id*. at 375-62.)

Wright then recounted that on August 2, 1981, he had a drug deal arranged with Jackson

and that the deal did not go through.  (*Id*. at 380-81.)  In particular, Wright stated that he went to

Jackson's house at noon and again at 3:00 p.m., after which Jackson told him to come back at

5:00 p.m.  (*Id*. at 381-84.)  Wright testified that he never went back to Jackson's house that day

and later learned that someone had killed Jackson, after which the police interviewed him on

August 3, 1981.  (*Id*. at 385-86.)  Wright testified that he told the police that he had been to

Jackson's house on August 2, 1981, but that he did not know who committed the murder.  (*Id*. at

386, 393.)

Also, Wright testified that on August 2, 1981, he saw Coleman at a Clark gas station

where Wright's brother worked and that the gas station was about five blocks from Jackson's

house.  (*Id*. at 394-96.)  Wright explained that at that time, Coleman introduced him to Barnes

and then Coleman and Barnes asked Wright to drop them off at 69th Street.  (*Id*. at 396.)  Wright

testified that when he was driving Barnes and Coleman to 69th Street, they talked about shooting

someone and then exchanged guns.  (*Id*. at 397-98.)  Also, Wright stated that he saw Coleman

three days after Jackson's murder and that Coleman tried to sell him a medallion with the initials

"TJ" on.  (*Id*. at 415-16.)  Wright recognized that the medallion was Jackson's medallion.  (*Id*. at

416.)  Consequently, when Wright talked to the police for the second time on August 18, 1981,

he told them about the medallion and also about being in the car with Coleman and Barnes,

explaining that they had guns at that time.  (*Id*. at 418-19.)

###### 6.    Gwen Thomas Jackson

Gwen Thomas Jackson, Terrell Jackson's stepdaughter, also testified at the August 2011

habeas hearing.  Gwen testified that in August 1981 she lived at 6856 South Calumet Avenue in

Chicago with her mother, stepfather, sisters, brothers, uncle, and her three day old son.  (*Id*. at

432-33.)  Further, she testified that she knew Roy Wright because he was her stepfather's friend.

(*Id*. at 433.)  She explained that she never had a relationship with Wright and that the father of

her child was Marvin Love.  (*Id*.)  She also recounted that she saw Wright on many occasions

because he was involved in her stepfather's drug business.  (*Id*. at 434-35.)  Also, she testified

that she saw Wright on the afternoon of her stepfather's murder.  (*Id*. at 435-36.)  At that time,

her uncle, Arlander Adamson, had let Wright into the house.  (*Id*. at 437.)

### 7.    Maurice Coleman

Next, Maurice Coleman testified at the August 2011 evidentiary hearing explaining that

in 1981 he lived with his sister on 45th Street and Champlain Avenue in Chicago and that he

worked in construction "on and off."  (*Id.* at 438.)  Coleman further testified that he knew of

Joseph Barnes from the neighborhood, but denied that he had a relationship with him involving

the sale or distribution of illegal narcotics.  (*Id*. at 438-39.)  He specified that he knew Roy

Wright because Wright was a friend of Coleman's younger brother.  (*Id*. at 439-40.)  Coleman

denied that he had a relationship with Roy Wright and he further testified that he did not sell

drugs with Wright or Jackson.  (*Id*. at 440.)  Coleman also denied that he had ever been to

Jackson's home and that he did not know who Adamson was until Adamson testified against him

at his preliminary hearing.  (*Id*. at 441-42.)  Similarly, Coleman stated that he had never met

Thomas until his criminal trial.  (*Id.* at 441.)  Coleman then denied that he had participated in

Jackson's murder.  (*Id.*)

Coleman further articulated that he was at Evelynn Cade's house with Loretta Cade and

his two year old daughter when the police arrested him in August 1981.  (*Id*. at 442.)  He

explained that his first attorney was a public defender and then he hired Geary Kull to represent

him and that later Kull was court-appointed.  (*Id*. at 442-43.)  Coleman stated that he met with

Kull approximately seven or eight times before trial, at which time he told Kull that he did not

commit the offense.  (*Id.* at 443-44.)  Coleman recalls that Kull mentioned Roy Wright and that

Coleman explained to Kull that he knew Wright through his brother.  (*Id*. at 444.)  Coleman also

described where he was the day of the murder, namely, at Evelynn Cade's house, and that he

gave Kull the Cades' names, address, and telephone number.  (*Id.* at 445.)  Coleman explained

that he told Kull about Evelynn Cade because he was house-sitting for the Cades.  (*Id*.)  He also

testified that he drove Evelynn and Fred Cade to the airport at the end of July or early August

1981 and that he talked to Evelynn Cade on the telephone on August 2, 1981, when she was out

of town.  (*Id*. at 446-47.)  Coleman contends that he told Kull this information and that Kull

never asked him about the Cades or informed him about any follow-up after he told Kull this

information.  (*Id*. at 448-50.)

Further, Coleman testified that he first heard about the Wilkins brothers from his

appellate attorney after his 1983 conviction.  (*Id*. at 450.)  Coleman stated that he found out

about the defense attorneys' affidavit concerning the Wilkins brothers a few years after his

conviction and that his attorney filed the affidavit under seal for appellate purposes.  (*Id*. at 451.)

Coleman further testified that Kull never discussed the affidavit regarding the Wilkins brothers

with him.  (*Id*. at 451-52.)

On cross-examination, Coleman testified that he knew Barnes' wife through Coleman's

sister and admitted that he was on Barnes' visitors list at the Illinois Department of Corrections

explaining that his sister asked him to drive Barnes' wife to the Department of Corrections to visit Barnes. (*Id.* at 457-59.) Coleman, however, testified that he did not drive Barnes' wife to see Barnes in prison. (*Id.* at 459.) Coleman also admitted that he was arrested for disorderly conduct along with other individuals, including Barnes, during a "sweep" in June 1981. (*Id.* at 459-60.) In addition, Coleman acknowledged that he knew of Roy Wright through his brother. (*Id.* at 460-61.) He further testified on cross-examination that he left the Cades' home on August 3, 1981, to socialize with friends at a park. (*Id.* at 484-85.)

### C. Prior Evidence

#### 1. Trial Testimony

Because the Court must look at all evidence "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," to determine if "it was more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," *see House,* 547 U.S. at 537 (citation omitted), the Court briefly summarizes the evidence presented at Coleman's 1983 criminal trial. In particular, at trial, eyewitnesses Adamson and Thomas testified that on August 2, 1981, two men – who they later identified as Coleman and Barnes – burst through the rear door of Jackson's home. Adamson explained that these two men had guns, wanted to kill him, and bound his hands behind his back and gagged him. Adamson also testified that Coleman and Barnes then forced him upstairs at gunpoint. After they arrived at Jackson's room, Coleman and Barnes ordered Adamson to lie on the floor and fired six shots at Jackson. One of the men then left the room and went to Thomas' room where he told her to come with him. He directed Thomas to Jackson's room where Thomas saw Jackson and Adamson lying on the floor. The

24

perpetrators threatened to kill everyone after which they ransacked the room and took certain items, including jewelry. Shortly thereafter, Jackson died of his gunshot wounds.

Trial evidence also established that after Jackson's murder, Thomas looked through a book of photographs that Chicago Police Detectives brought to the home of Thomas' friend. Thomas identified a picture of Coleman as one of the offenders. On the following day, Thomas and Adamson identified Coleman in a lineup at a Chicago police station and also made in-court identifications of Coleman at his 1983 jury trial.

### 2. 1995 Post-Conviction Hearing Testimony

In determining Coleman's actual innocence claim, the Court must also look to the 1995 Illinois post-conviction hearing testimony under the *Schlup* analysis. As the Seventh Circuit instructed, "as a general matter, at its evidentiary hearing the district court should accord a presumption of correctness to the state court's credibility determination," although such "'deference does not imply abandonment or abdication of judicial review.'" *Coleman,* 628 F.3d at 320 (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)).

As discussed above, the Illinois Appellate Court reviewed the trial court's credibility assessments and concluded that Barnes was not a credible witnesses. In particular, the Illinois Appellate Court noted that Barnes had presented three conflicting defenses during separate sworn proceedings: (1) at his extradition hearing in Baltimore, he testified that he was in Baltimore at the time of Jackson's murder; (2) at trial, his attorney presented an alibi defense that Barnes was at home in Chicago with his family; and (3) during the 1995 evidentiary hearing on Coleman's post-conviction petition, Barnes admitted his presence at the murder scene and

asserted self-defense. The Illinois Appellate Court further recognized that Barnes' 1995 hearing testimony differed from that of his defense attorney Rhodes' 1995 hearing testimony. Rhodes, for example, stated that during the jury's deliberations at the 1983 criminal trial, Barnes told him that Coleman was not involved in Jackson's murder and that Barnes did not tell him anything else. Barnes, on the other hand, testified that he told Rhodes that he was at the crime scene and that Roy Wright was involved in the murder. The Illinois Appellate Court then concluded that "Barnes' recent testimony exonerating defendant, inculpating himself and claiming self-defense contains no indicia of reliability." *See Coleman,* No. 1-95-4039, at *13.

### D. Probabilistic Determination

Under *Schlup* and *House*, the Court must assess the likely impact of Coleman's new evidence on reasonable jurors. *See House,* 547 U.S. at 538. To do so, the Court must make a "probabilistic determination of what reasonable, properly instructed jurors would do." *Schlup,* 513 U.S. at 329. "In making a probabilistic determination, it 'must be presumed' that jurors obey the instructions of the court, including the instruction requiring proof beyond a reasonable doubt." *Coleman,* 628 F.3d at 319 (quoting *Schlup,* 513 U.S. at 329). As the *House* Court explained, "[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. If new evidence so requires, this may include consideration of 'the credibility of the witnesses presented at trial'" as well as the "likely crediblity of the [new] affiants." *House,* 547 U.S. at 538-39 (quoting *Schlup*, 513 U.S. at 330, 332); *see also Coleman,* 628 F.3d at 319 ("The actual innocence inquiry may also involve credibility assessments and a consideration of the strength of the government's case.").

The Court first turns to Evelynn and Loretta Cades' affidavits dated July 11, 1999 and July 8, 2000, respectively. The timing of these submissions – approximately 16 and 17 years after Coleman's criminal trial – bears on the reliability of this new evidence. *See Schlup,* 513 U.S. at 332. In particular, a lapse of time often distorts a witness' recollection. *See Krist v. Eli Lilly & Co.,* 897 F.2d 293, 296-97 (7th Cir. 1990). Not only is this evidence's reliability at issue, Loretta Cade's 2011 hearing testimony and averments in her 2000 affidavit lack credibility due to her bias and familial relation to Coleman, namely, that Coleman was her boyfriend at the time of the incident and the father of her daughter, Shavon. *See Johnson v. Loftus,* 518 F.3d 453, 457 (7th Cir. 2008). The same holds true for Evelynn Cade's averments because she was Shavon's grandmother. *See Hayes v. Battaglia,* 403 F.3d 935, 938 (7th Cir. 2005) (family solidarity may produce false alibi testimony). Indeed, at his July 26, 2011 deposition, Coleman characterized Evelynn and Fred Cade as his in-laws. (R. 138-12, Ex. L, 7/26/11 Coleman Dep., at 9.) Meanwhile, Evelynn Cade's averment that she talked to Coleman at the exact time of Jackson's murder, namely 5:00 to 5:15 on August 2, 1981, raises reliability and credibility issues. As the *House* Court explains, testimony in which the witness has no motive to lie has "more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused." *See House,* 547 U.S. at 552. Here, both Loretta and Evelynn Cade had a motive to lie due to their familial relationship with Coleman.

In addition, Loretta Cade's August 2011 evidentiary testimony lacked credibility based on her demeanor, bias, and her testimony's numerous inconsistencies. Loretta Cade testified, for example, that Coleman, Shavon, and she never left the house during the entire time her parents were on vacation, yet Coleman testified that he left the house on the morning of August 3, 1981

to socialize with friends. Loretta Cade's testimony is further undermined by Coleman's oral

statement to the Chicago police and assistant state's attorneys on August 19, 1981, in which he

stated that he did not remember where he was or what he was doing on August 2, 1981. (R. 147-

1, Pet. Ex. 7, 08/19/81 Felony Review Memo.) The Court thus concludes that the probative

value of Loretta Cade's testimony is questionable based on her credibility issues.

Meanwhile, based on his demeanor, interests, and conflicting testimony, Barnes was not a

credible witness and his testimony and affidavits are not reliable. Not only did Barnes present

three conflicting defenses during his extradition hearing, at trial, and during the 1995 evidentiary

hearing on Coleman's post-conviction petition, Barnes 1995 post-conviction hearing testimony

and his 2011 habeas hearing testimony conflict with other evidence in the record. At the 1995

post-conviction and 2011 habeas hearings, for example, Barnes claims that he was acting in self-

defense because Jackson pulled a gun on him. (R. 151-2, Pet. Ex. 15, 1995 Hr'g Test., at 45-47.)

He also stated at the August 2011 hearing that Hall was shot during the August 2, 1981 incident.

Yet, according to the August 3, 1981 Chicago police report, the police found an unloaded .22

caliber revolver between Jackson's box spring and mattress. (R. 147, Pet. Ex. 1, 8/3/81 CPD

report.) Also, a firearms expert at Coleman's 1983 criminal trial testified that none of the bullets

recovered from crime scene were fired from Jackson's gun. (R. 42-1, Trial Tr., at 1570.) Thus,

not only is Barnes' testimony undercut by other credible evidence in the record, but his

credibility is further undermined by his admission at Coleman's 1995 post-conviction hearing

that he presented a perjured defense. (R. 151-3, Pet. Ex. 15, 1995 Hr'g Tr., at 62.)

Likewise, Barnes' August 2011 hearing testimony in which he stated that Wright, Hall,

and he were involved in Jackson's murder is contradicted by the Wilkins brothers' statements

that they saw two individuals around Jackson's home on the day of the robbery-murder. Also, Barnes' testimony that there were three perpetrators is contradicted by Thomas' and Adamson's eyewitness trial testimony. In addition, there is no corroborating evidence in the record that one of the perpetrators was shot – as Barnes testified at the August 2011 habeas hearing. Barnes' statement that Wright, Hall, and he were involved in the robbery-murder is further contradicted by Barnes' prior declaration of his innocence in his 1990 affidavit supporting of his Illinois post-conviction petition. (R. 138-1, Ex. A, Appx. B, 1990 Barnes' Aff. ¶ 5; *see also* R. 151-2, Pet. Ex. 15, 1995 Hr'g Tr. at 24.) In addition, Barnes had a motive for implicating Wright in Jackson's murder, namely, that Wright was the police informant who connected Barnes to Jackson's murder. (R. 151-3, 1995 Hr'g Test., at 87-88.)

Finally, notwithstanding the fact that Barnes' statement that he told Rhodes that Coleman was not involved in Jackson's murder is corroborated by Rhodes' hearing testimony, this testimony does not outweigh the numerous inconsistencies in Barnes' statements or refute the fact that his testimony and averments are unreliable and lack credibility. Moreover, Rhodes was merely reporting what Barnes had told him – he did not comment as to the veracity of Barnes' statement – and Rhodes did not have personal knowledge of the underlying events. Therefore, based on the Court's review of the record and Barnes' demeanor and testimony at the August 2011 hearing, the Court agrees with the post-conviction Illinois Appellate Court when it concluded that Barnes' testimony has no indicia of reliability. *See* 28 U.S.C. § 2254(e)(1); *Coleman,* 628 F.3d at 320 ("district court should accord a presumption of correctness to the state court's credibility determination").

Next, the Court turns to Coleman's August 2011 evidentiary hearing testimony. Based

on Coleman's demeanor, motive to lie, and his contradictory statements, Coleman's hearing testimony is not reliable or credible. Coleman's contradictory statements include his August 2011 evidentiary hearing testimony when Coleman testified that he knew Barnes from the neighborhood and that he had been arrested with Barnes in a sweep prior to the Jackson murder. In contrast, at his July 26, 2011 deposition, Coleman testified that the first time he met Barnes was during the course of his criminal trial. (R. 138-12, Ex. L, 7/26/11 Coleman Dep., at 15-17.) Also at the August 2011 evidentiary hearing, Coleman testified that he did not know about the Wilkins brothers until his appeal, but Kull testified that he mentioned David Wilkins' potential testimony in his opening statement and presented evidence of David Wilkins' inability to identify Coleman when he cross-examined Detective O'Leary at Coleman's 1983 criminal trial. (R. 165, Hr'g Tr. at 47-48, 106.)

As discussed above, Adamson and Thomas – who were both at the scene and victims of the crime – testified at trial that they saw Coleman during the commission of the crime. Thomas identified Coleman in a book of photographs that Chicago Police Detectives showed her, and both Thomas and Adamson identified Coleman in a lineup at a Chicago police station. Further, Thomas and Adamson made in-court identifications of Coleman at his jury trial. Also at Coleman's 1983 criminal trial, Adamson testified that he stood not more than a half a foot away from Barnes and Coleman when they entered Jackson's livingroom on August 2, 1981. (R. 42-1, Trial Tr., at 1369-70.) Similarly, Thomas testified that when she first saw Coleman in her bedroom, he was approximately two feet away from her. (*Id*. at 1438.) Thomas further stated that Coleman and she looked at each other face-to-face. (*Id*. at 1459.) In addition, Thomas testified that Coleman tied her up with a piece of rope and that Barnes took the chain off of her

30

neck. (*Id.* at 1461-62.)[4]

Accordingly, Thomas' and Adamson's eyewitness accounts are credible and reliable because they had sufficient opportunity to observe Coleman and Barnes during the commission of the crime. *See Morales,* 659 F.3d at 606. And, even though Coleman's attorney attempted to impeach Adamson's and Thomas' credibility at the 1983 criminal trial, their identifications of Coleman were not seriously refuted, despite Coleman's argument that their eyewitness testimony alone would cause a reasonable juror to question the State's case. *See United States v. Hall,* 165 F.3d 1095, 1105 (7th Cir. 1999) ("the hazards of eyewitness identification are 'well within the ken of most lay jurors'") (citation omitted); *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986) ("problems with perception and memory are easily understood by jurors and can be adequately addressed through cross-examination").

Moreover, although Wright's testimony may not be overwhelmingly probative based on his prior convictions and admission that he was a drug dealer, *see House*, 547 U.S. at 552, his August 2011 hearing testimony supports Thomas' and Adamson's trial testimony. Specifically, Wright testified that he saw Coleman at a Clark gas station at which time Coleman introduced him to Barnes. Coleman and Barnes then asked Wright to drop them off at 69th Street near Jackson's home. Wright further testified that when he was driving, Barnes and Coleman talked about shooting someone and then exchanged guns. Wright also explained that he saw Coleman

---

[4] Although the Seventh Circuit commented that the "jurors heard no testimony about Jackson's involvement in drugs or drug dealing," *see Coleman*, 628 F.3d at 321, Adamson testified at Coleman's 1983 criminal trial that he told the police that Jackson was a drug dealer. (R. 42-1, Trial Tr., at 1481.) Further, Coleman's defense counsel emphasized that Jackson was drug dealer in his closing arguments. (*Id.* at 1871.)

three days after Jackson's murder and that Coleman tried to sell him a medallion with the initials

"TJ" on it. Wright recognized that the medallion was Jackson's medallion. Also, Wright's

August 2011 hearing testimony is consistent with his statements to the Chicago police on August

18, 1981 and his testimony at Coleman's September 24, 1981 preliminary hearing. (R. 147-1,

Pet. Ex. 5, 8/18/81 Supp. Report, at 2-3, R. 152-2, Pet. Ex. 9, Prelim. Hr'g Tr., at 40-45.) And,

although Wright's knowledge of Jackson's drug dealings is similar to Barnes' recollection of the

drug deal gone awry in August 1981, evidence in the record reveals that Wright was Jackson's

"middleman" in other drug transactions during this time period. Finally, even though Wright's

testimony may lack credibility due to Barnes implicating him in the crime, the Court recognizes

that Chicago police officers interviewed Wright on both August 3, 1981 and August 18, 1981,

and assistant state's attorneys also interviewed him on August 18, 1981, yet Wright was never

charged with Jackson's murder. (*See* R. 147-1, Pet. Ex. 5, 8/18/81 Supp. Report, at 3.)

Nevertheless, Coleman contends that Adamson and Thomas had a motive to incriminate

him as one of the perpetrators because Thomas had a relationship with Roy Wright. Coleman

further hypothesizes that Adamson and Thomas were trying to conceal Wright's involvement in

the murder. Coleman's theory, however, is undercut by Thomas' and Wright's August 2011

hearing testimony in which they both denied any such relationship, even though Coleman's

investigator averred in 1994 that Adamson had told him that Wright and Thomas had a "thing"

for a while. (R. 151-1, Pet. Ex. 14, Hodges Aff. ¶ 10.) The inspector's statement that Wright

and Thomas had a "thing" at an unspecified date or time does little to refute Wright's and

Thomas' August 2011 hearing testimony that they were not in a romantic relationship at the time

of Jackson's murder. In addition, Thomas testified at the August 2011 hearing that the father of

her child was Marvin Love, not Wright.

More importantly, Coleman fails to cite to any other evidence – except for Barnes' questionable testimony – to support his theory and merely speculates that the real culprit is Roy Wright. Indeed, although Barnes' 1995 and 2011 hearing testimony implicated Wright in Jackson's murder, his November 9, 2008 petition for relief of judgment filed in the Circuit Court of Cook County, Barnes stated that "Roy Wright was not a victim nor a witness to the crime that occurred on 8/2/81, that resulted in the murder of Terrell Jackson." (R. 138-4, Ex. D, 11/9/08 Pet., at 7.) Barnes made similar statements that Wright was not at the scene of Jackson's murder in his July 13, 2011 motion for leave to file a successive federal habeas petition – that the Seventh Circuit denied. (R. 145-3, Corrected Ex. E, Pro se Mot. Leave to File Successive Habeas, at 10, 11, 14, 16; *see also* 11-2582, R. 4, 7/20/11 Order.) Therefore, Coleman's reliance on Barnes' 1995 and 2011 hearing testimony to support his theory that Wright was the real culprit is contradicted by Barnes' own statements.

In summary, assessing how reasonable jurors would react to the overall, newly supplemented record, Coleman has not demonstrated that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See House,* 547 U.S. at 538. In other words, Coleman has not persuaded the Court that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 329. In particular, Coleman's new evidence does not include documentary, biological, or reliable evidence such as a "non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes*, 403 F.3d at 938; *see also Schlup,* 513 U.S. at 324 (petitioner must support his actual innocence allegation "with new

reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.").  Instead, Coleman presented the testimony and affidavits of witnesses who lacked credibility and gave conflicting testimony.  In fact, Coleman's own testimony that he was at the Cades' home on August 2, 1981 is undermined by his statement to the police and assistant state's attorneys that he did not know where he was on the date of Jackson's murder.  Weighed against the reliable and consistent eyewitness testimony of Thomas and Adamson, the newly presented evidence does not establish the actual innocence gateway exception to Coleman's procedurally defaulted Sixth Amendment ineffective assistance of trial counsel claims.  *See, e.g., Holmes v. Hardy,* 608 F.3d 963, 968-69 (7th Cir. 2010); *Woods v. Schwartz,* 589 F.3d 368, 377 (7th Cir. 2009).  The Court, however, turns to the merits of Coleman's ineffective assistance of counsel claims for the sake of completeness.

## II.	Ineffective Assistance of Counsel Claims

To establish constitutionally ineffective assistance of counsel, Coleman must establish that (1) his attorney's performance "fell below an objective standard of reasonableness," and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different" meaning "a probability sufficient to undermine confidence in the outcome."  *Strickland,* 466 U.S. 668, 688, 694.  The Court's "review of the attorney's performance is 'highly deferential' and reflects 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'"  *Koons v. United States,* 639 F.3d 348, 351 (7th Cir. 2011) (citation omitted).  To establish prejudice, it is not

34

enough "to show that the errors had some conceivable effect on the outcome of the proceeding," instead trial counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Morgan v. Hardy,* 662 F.3d 790, 802 (7th Cir. 2011) (quoting *Strickland,* 466 U.S. at 687, 693). If Coleman fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *See id.* at 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant").

Coleman did not present his ineffective assistance of counsel claims to the Illinois Appellate Court, therefore, in reviewing Coleman's habeas claims, the Court must employ the general standard set forth in 28 U.S.C. § 2243 that requires the Court to "dispose of the matter as law and justice require," which is "a more generous standard" than Section 2254(d)(1). *See Morales,* 659 F.3d at 599 (citations omitted). As the Seventh Circuit instructs, the standard under Section 2243 means "that we review the petitioner's constitutional claim with deference to the state court, but ultimately *de novo.*" *Kerr v. Thurmer,* 639 F.3d 315, 326 (7th Cir. 2011). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter,* ___ U.S. ___, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). With these standards in mind, the Court turns to Coleman's ineffective assistance of counsel claims.

### A.     Evelynn and Loretta Cades' Testimony

In support of his habeas petition, Coleman argues that his trial counsel, Geary Kull, rendered ineffective assistance of counsel by failing to call both Evelynn and Loretta Cade at his 1983 criminal trial. The Court disagrees. Based on the record, including Loretta Cade's

35

testimony at the August 2011 evidentiary hearing, Kull's decision not to pursue the Cades' alibis after they disavowed them and refused to participate in Coleman's defense was objectively reasonable according to prevailing professional norms. *See Strickland,* 466 U.S. at 687-88. In particular, based on his demeanor, his considerable criminal defense experience at the time of his representation of Coleman, and the consistency of his hearing testimony, Kull gave very credible testimony that when he visited Evelynn and Loretta Cade at their home in 1982, they told him they were not interested in testifying, they did not want to be involved, and that they did not remember whether Coleman was at their home on August 2, 1981. Kull further explained at the August 2011 habeas hearing that based on his encounter with the Cades, he decided that he was not going to put hostile or antagonistic witnesses on the stand. Kull also indicated that he thought their potential alibi testimony was faulty. *See Nix v. Whiteside,* 475 U.S. 157, 174-76, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (Sixth Amendment right to effective assistance of counsel not violated when counsel refuses to present perjured testimony). Indeed, the Cades' potential alibi testimony conflicts with Coleman's oral statement to the Chicago police on August 19, 1981, in which he stated that he did not remember where he was or what he was doing on August 2, 1981. Also, Loretta Cade's August 2011 hearing testimony that she met with Kull in 1982 and explained her alibi testimony is undermined by her failure to remember any details of her meeting with Kull or the circumstances surrounding the creation of her 2000 affidavit. (*See* 166, Hr'g Tr. 307-11, 351-52.) In contrast, she testified that she remembered very specific details of the August 2, 1981 events.

As such, Kull has provided support for his strategic decision not to call the Cades as witnesses, and it is well-settled that as "long as an attorney articulates a strategic reason for a

decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel." *Yu Tian Li v. United States,* 648 F.3d 524, 527-28 (7th Cir. 2011). In other words, Kull's choice not to call the Cades as witnesses was a tactical decision that was reasonable under the circumstances. *See Smith v. Gaetz,* 565 F.3d 346, 354 (7th Cir. 2009).

Moreover, as *Strickland* teaches, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. At the time of Kull's representation of Coleman, he did not know certain information that the Cades provided in their 1999 and 2000 affidavits or Loretta Cade's August 2011 hearing testimony. Instead, he knew that the Cades did not remember whether Coleman was at their house on August 2, 1981 and that they were not willing to get involved. This is not the same situation as in *Raygoza v. Hulick,* 474 F.3d 958 (7th Cir. 2007), in which defense counsel failed to interview and investigate available alibi witnesses. *See id.* at 965. Here, Kull reached out to the Cades who refused to get involved and did not remember whether Coleman was at their home on August 2, 1981. *See Harrington*, 131 S.Ct. at 789 ("[a]n attorney need not pursue an investigation that would be fruitless"). The Cades' refusal to testify at Coleman's trial is underscored by Loretta Cade's testimony at the August 2011 evidentiary hearing that: (1) she did not see Coleman after the day he was arrested; (2) she did not know what was going on during Coleman's criminal trial; (3) she did not attend Coleman's criminal trial; and (4) she had to move on with her life. (R. 166, Hr'g Tr. at 306-07, 453-54.)

As discussed above, Loretta Cade's 2011 hearing testimony and averments in her 2000

affidavit lack credibility due to her bias and familial relation to Coleman. *See Johnson,* 518 F.3d at 457 (7th Cir. 2008); *see, e.g., Raygoza,* 474 F.3d at 964. Evelynn Cade's averments are similarly biased because she was Shavon's grandmother. *See Hayes,* 403 F.3d at 938. In sum, Kull's decision not to pursue the Cades' alibi testimony and call the Cades as witnesses was not constitutionally deficient, but fell within the wide range of reasonable professional assistance. *See Strickland,* 466 U.S. at 689-90. Put differently, Coleman has not overcome the presumption that under the circumstances, Kull's decision was sound trial strategy. *See Koons,* 639 F.3d at 351. Because Coleman has failed to establish the *Strickland* performance prong as to Kull's failure to call Evelynn and Loretta Cade as witnesses, the Court need not discuss the *Strickland* prejudice prong. *See Malone v. Walls,* 538 F.3d 744, 758 (7th Cir. 2008).

### B. Wilkins Brothers' Testimony[5]

Next, Coleman maintains that trial counsel was ineffective for failing to secure and call the Wilkins brothers at trial. The Court turns to the *Strickland* prejudice prong because it is dispositive. *See Strickland,* 466 U.S. at 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant"). Even though Kull did not call the Wilkins brothers as witnesses at Coleman's criminal trial, Kull explained at the August 2011 evidentiary hearing that he brought out David Wilkins' failure to identify Coleman when he cross-examined Chicago Police Detective James O'Leary at trial. (R. 165, Hr'g Tr., at 47-48.) Specifically, Kull's cross-examination of Detective O'Leary established that David Wilkins had seen two men at 69th Street and Calumet Avenue in Chicago

---

[5] Coleman did not call Tracey or David Wilkins as witnesses at the August 2011 habeas hearing.

before the murder and that the police asked David Wilkins to view Coleman's lineup, but he could not identify Coleman. (R. 42-1, Trial Tr., at 1646-47, 1656-57.) Accordingly, the exculpatory aspect of David Wilkins' testimony was brought out at trial and because the jury heard testimony concerning David Wilkins' inability to identify Coleman as one of the two suspects on the day of the murder, Coleman has not demonstrated that there is a reasonable probability that but for Kull's alleged error in not calling the Wilkins brothers as witnesses, the result of his criminal trial would have been different. *See Atkins v. Zenk,* 667 F.3d 939, 946 (7th Cir. 2012).

### C.    Severance

Notwithstanding the fact that Rhodes and Kull moved to sever Barnes' and Coleman's criminal trial on several occasions to no avail, Coleman argues that trial counsel rendered ineffective assistance of counsel by failing to secure a severance. Coleman specifically maintains that Kull's performance was constitutionally deficient because he failed to reveal the Wilkins brothers' potential testimony to the trial court.

First, as Rhodes and Kull explained at the December 3, 1982, severance motion hearing, counsel was relying on Illinois Supreme Court Rule 415 for criminal discovery, now codified at ILCS S.Ct. Rule 415, in support of their request to present the Wilkins brothers' potential testimony ex parte, in camera, and under seal. (R. 147-2, Pet. Ex. 10-A, 12/3/82 Severance Hr'g Tr., at 141-42.) In particular, counsel relied on the committee note to Rule 415(f), which states:

> Paragraph (f) provides for preserving the confidentiality of material at such times as the trial court is called upon to decide whether to require its disclosure. In issuing protective orders under paragraph (d), allowing excision of portions of material under paragraph (e), or in otherwise deciding that certain material is not subject to disclosure, the trial court must have an opportunity to examine, in private, the particular material as well as the reasons for non-disclosure. The

purpose of issuing such rulings would often be defeated if the hearing were to be held in open court.  To protect the litigants from error by the trial court, provision is made for the making and preserving of a record of all such proceedings for purposes of appeal.

Kull further explained to the trial court at the April 18, 1983 severance hearing that Barnes and Coleman based their motion to sever on antagonistic defenses and that under the discovery rules they did not need to disclose to the State what the antagonistic defenses may be. (Pet. Ex. 10A, 4/18/83 Severance Hr'g Tr., at 176-77.)  Rhodes further clarified that if the State were to hear the basis of their severance motion, it would be prejudicial to their clients.  (*Id.* at 178.)  Thus, Rhodes and Kull requested an in camera, ex parte review of the Wilkins brothers' potential testimony – a request that the trial court denied.  In other words, the trial court rejected counsel's proposal and refused to review the Wilkins brothers' statements.  On April 22, 1983, Kull and Rhodes presented their affidavit of the Wilkins brothers' potential testimony as an offer of proof for their severance motion to be impounded by the clerk for appellate purposes.  (Pet. Ex. 10A, 4/22/83, Trial Tr., at 1046.)

As Kull credibly explained at the August 2011 evidentiary hearing, he was not sure if the State was aware of the Wilkins brothers' ability to place Barnes at the crime scene, therefore, he did not want to disclose to the State any such evidence due to the possible benefit to the State. (R. 166, Hr'g Tr., at 57-59, 68-69, 70-71.)  Also, Kull's trial strategy involved discrediting Thomas' and Adamson's identification of Coleman and by corroborating their identification of Barnes, the Wilkins brothers' testimony may have correspondingly bolstered the reliability of Adamson's and Thomas' identification of Coleman.  *See Harrington,* 131 S.Ct. at 790 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.").

40

Kull's decision not to call the Wilkins brothers as witnesses at trial is further buttressed by a letter Coleman's appellate attorney, Patricia Unsinn, sent to Coleman in 1985 in which she explained that Kull told her that he had decided against calling the Wilkins brothers because "they hedged on whether they could state you were not one of the offenders." (R. 138-10, Ex. J, 2/26/85 Unsinn Letter.) She further articulated that Kull "decided their testimony was not that valuable as compared to the danger that they might provide damaging testimony when examined by the State on cross." (*Id.*) Finally, as discussed above, the exculpatory part of David Wilkins' testimony came out at trial when Detective O'Leary testified that David Wilkins could not identify Coleman at the lineup.

Again, Coleman has failed to overcome the presumption that Kull's decision not to reveal the reasons for the severance motion falls within the wide range of reasonable professional assistance. *See Strickland,* 466 U.S. at 689-90; *Yu Tian Li,* 648 F.3d at 528. Because Kull's performance was not constitutionally deficient, the Court need not address the *Strickland* prejudice prong under the circumstances. *See Atkins,* 667 F.3d at 946 ("courts need not address both prongs of *Strickland.*").

### D. Overall Performance

Finally, as the Seventh Circuit teaches, courts must "assess counsel's work as a whole, and 'it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief'" under *Strickland*. *See Pole v. Randolph,* 570 F.3d 922, 934 (7th Cir. 2009) (citation omitted). Assessing Kull's overall representation, including his strategic choices discussed above, he provided constitutionally effective assistance of counsel to Coleman. Kull's defense strategy was that Adamson and Thomas misidentified Coleman and that they were not

41

credible witnesses.  Coleman's case-in-chief included the testimony of Terrell Jackson's niece, Dorothy Davis, who testified that while she was running over to Jackson's house shortly after the shooting, she encountered two men driving away from the crime scene in a blue car, one of whom asked if she was on her way to see Jackson.  (R. 42-2, Trial Tr., at 1675-76.)  Davis did not identify Barnes or Coleman as the men in the blue car when questioned by police, but instead identified other individuals from a photo lineup.  (*Id.* at 1678.)

Kull also called Chicago Police Officer Phyllis Hamm as a witness at Coleman's 1983 criminal trial.  (*Id.* at 1702.)  Officer Hamm interviewed Adamson and Thomas on the night of the murder and admitted that neither witness initially reported that the suspects had taken property during the commission of the crime.  (*Id.* at 1702-03.)  Likewise, Kull elicited testimony from Chicago Police Inspector Patrick Carroll in which Carroll acknowledged that Thomas did not mention that the perpetrators had taken her necklace.  (*Id.*)  Kull also established by stipulation that the fingerprints lifted at the crime scene did not match Coleman's prints.  (*Id.* at 1729-30.)

Furthermore, on cross-examination of the government's firearms expert, Kull attacked the expert's methodology and forced the expert to admit that there were several omissions in his report.  (R. 42-1, Trial Tr., at 1582-90).  Kull also impeached Adamson on several points using Adamson's preliminary hearing testimony.  (*Id.* at 1394-95, 1399-1400, 1403-16.)  At closing, Kull stressed that no physical evidence tied Coleman to the scene of Jackson's murder.  He also attacked Thomas' credibility, recounted his impeachment of Adamson, and reiterated Detective O'Leary's testimony that David Wilkins did not identify Coleman as one of the men on Jackson's back porch the day of the murder.  (R. 42-2, Trial Tr., at 1866-96.)  Finally, Kull

42

successfully argued against the imposition of the death penalty at the sentencing phase of Coleman's trial. (R. 42-4, Trial Tr., at 2071-73, 2087-88.)

Therefore, based on the record, the Court would be hard-pressed to conclude that Kull's performance was objectively unreasonable under *Strickland* and its progeny. *See Harrington*, 131 S.Ct. at 788 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom") (citing *Strickland*, 466 U.S. at 690.) Accordingly, Coleman's ineffective assistance of trial counsel claim fails.

## III. Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Therefore, the Court must determine whether to grant Coleman a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in the present Memorandum, Opinion, and Order.

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, instead, he must first request a certificate of appealability. *See Miller-El,* 537 U.S. at 335; *Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El,* 537 U.S. at 336; *Narvaez v. United States,* 641 F.3d 877, 881 (7th Cir. 2011); 28 U.S.C. § 2253(c)(2). Under this standard, Coleman must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve

43

encouragement to proceed further." *Miller-El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

Based on Kull's very credible testimony explaining his reasons for not calling Evelynn and Loretta Cade and the Wilkins brothers as witnesses at Coleman's 1983 criminal trial, along with his description of his attempts to secure a severance, Coleman has failed to make a substantial showing of the denial of his Sixth Amendment right to effective assistance of counsel because jurists of reason would not debate that these claims should have been resolved in a different manner. Further, because Coleman has not made a substantial showing as to his ineffective assistance counsel claim, the incident issue of his actual innocence gateway claim does not fulfill the requirements under 28 U.S.C. § 2253(c)(2). *See Taylor v. United States,* 287 F.3d 658, 660 (7th Cir. 2002); *see also Herrera,* 506 U.S. at 404 (actual innocence is "not itself a constitutional claim"). Therefore, the Court declines to issue a certificate of appealability under the circumstances.

## CONCLUSION

For these reasons, the Court denies Coleman's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). The Court further declines to grant Coleman a certificate of appealability under 28 U.S.C. § 2253(c)(2).

Dated: April 10, 2012

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**

44